**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DERHONDA WARD,

     Plaintiff,

v.

COBB COUNTY SCHOOL
DISTRICT,

     Defendant.

Civil Action No. 1:22-cv-04453-SDG-RDC

**<u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT</u>**

Under Federal Rule of Civil Procedure 56, Defendant Cobb County School District ("CCSD") moves for summary judgment on Plaintiff DeRhonda Ward's claims:

## I.    INTRODUCTION.

When an employee exhibits severe job performance issues, repeatedly complains about doing her job, and is openly hostile to any constructive criticism or coaching from her bosses, that employee's days on the job are probably numbered. If the job deficits and bad attitude persist, even after being given an opportunity to improve, her boss is obviously justified in getting rid of her. The Family Medical

Leave Act ("FMLA") does not require the employer to keep a problem employee simply because that employee later took FMLA leave. Ward seems to think it does.

In the 2020-2021 school year, Ward was a school counselor at H.A.V.E.N. Academy at Skyview Elementary ("HAVEN") within CCSD. In early 2021, Ward exhibited significant deficits in communication and professionalism. After she refused to perform essential job duties, she received a letter of direction, and her principal placed a hold on her contract for the upcoming school year. Ward's principal then scheduled weekly review meetings with her to discuss how she needed to improve. At the first meeting on February 9, 2021, he told Ward he would review her performance over "the next few weeks," and "if all [were] well," he would tell CCSD to release her contract.

But Ward's job performance did not improve. In fact, it got much worse, with Ward being openly hostile, rude, and aggressive toward her principal and assistant principal nearly every meeting. After another disappointing meeting on March 18, 2023, the principal decided he had seen enough and could not recommend renewal of Ward's contract. At that point, the die was cast.

No reasonable juror could find that the principal's nonrenewal decision had anything to do with the FMLA leave Ward took a week later. Because the principal had legitimate business reasons for recommending nonrenewal, the Human

Resources Department forwarded that recommendation to the Superintendent, and the Superintendent non-renewed Ward's contract. If Ward wanted to save her job, she should have conducted herself accordingly during the weekly meetings and showed dramatic improvement in her underlying deficit areas. The FMLA did not insulate her from experiencing the negative consequences of her unprofessionalism.

## II.   STATEMENT OF FACTS.

HAVEN is a CCSD school that houses a self-contained Georgia Network for Educational and Therapeutic Services ("GNETS") program, catering exclusively to special education students who all have individualized education programs ("IEPs") designed by an IEP team. (Kelly Dec., attached to CCSD's Statement of Undisputed Facts ("SMF") as **Ex. 1**, ¶ 3; Ward Dep. I, attached to SMF as **Ex. 2**, at 33:19-34:12, 53:3-22.) During the 2020-2021 school year, Ward worked at HAVEN as a GNETS counselor, which is essentially a school counselor that focuses on GNETS students. (Ward Dep. I at 32:10-33:15, 34:14-16, 38:5-10, 41:17-42:8, Exs. 12, 16; Kelly Dec. ¶ 4.) Her common duties included serving on students' IEP teams, administering "career assessments" to students, and performing other duties her administrators assigned her. (Ward Dep. I at 38:5-23, 39:14-40:2, 51:23-54:5, 60:2-66:6, 81:25-82:8, 91:3-9, Exs. 13, 14; Kelly Dec. ¶ 4.) Isaac Kelly and Debra Lee were her principal and assistant principal, respectively. (Ward Dep. I at 38:11-23; Kelly Dec.

¶ 2.) The HAVEN Program Supervisor (Katrina Huels) was another administrator over Ward. (Ward Dep. I at 61:2-66:6; Kelly Dep., attached to SMF as **Ex. 3**, at 24:9-25:3, 69:1-70:5.)

**A.    In January 2021, Ward clashes with her co-workers, resists performing tasks assigned by her administrators, and receives a letter of direction.**

On January 13, 2021, teacher Nancy Wesselmann emailed Ward, copying Huels, and said, "Since we are meeting again to discuss eligibility, ESY and transition plan for [a student], I think it would be helpful for you to start reaching out now in an attempt to gather answers to those questions."  (Ward Dep. I at 45:8-47:12, Ex. 20 (CCSD0004123).) Ward asked for clarification about the request, and, on January 20, Ward copied Lee on the email chain, saying she was not was not "versed in completing any portion of a student's IEP." (*Id.* at Ex. 20 (CCSD0004122).)

The next day, Huels clarified the confusion, explaining that prior counselors had helped IEP teams with "administering career and other relevant testing for transition plans." (*Id.* at Ex. 20 (CCSD0004121).) After Ward gave a vague, non-committal response, Huels asked Ward directly how she saw herself "collaborating with the case manager in regard to career assessments. . . ." (*Id.* at Ex. 20 (CCSD0004119).) After 26 hours of no response, Huels had to follow-up with Ward

so that the student's IEP team could get the information they needed to proceed with his IEP. (*Id.* at Ex. 20 (CCSD0004118).)

Over four hours later, Ward again responded vaguely: "When I assist a student in completing a career assessment, results may be discussed with case managers as requested." (*Id.*) Within the hour, Huels expressed frustration at the back-and-forth: "There have been far too many emails in regard to this topic, yet we still don't know what you are going to actually do in regard to [CR]." (*Id.*) She also asked Ward several, direct, specific questions about her role in the process, again clarifying that she understood that Ward was not responsible for doing transition interviews. (*Id.* at 86:8-87:7, Ex. 20 (CCSD0004118).)

Despite all of Ward's professed confusion, Ward understood that her colleagues were asking whether she was the person who would administer the career assessment that the IEP team could use in crafting the student's IEP plan. (*Id.* at 76:1-7.) But Ward contends it is not one of her job duties to do career assessments at the specific request of an IEP team, for purposes of the IEP team using that assessment in crafting a student's IEP. (*Id.* at 84:16-86:7.)

Unfortunately, other HAVEN administrators had to intervene. On January 22, Lee met with Ward to discuss her role in relation to career assessments and the transition process. (*Id.* at 22:9-18, 88:13-90:7, 93:22-94:6, 160:4-21, Ex. 6 (Ward

548); Kelly Dec. ¶ 7; 1/22/21 Meeting Tr., attached to SMF as Ex. 4) Lee asked Ward to give her a yes-or-no answer on whether she would help Wesselmann with the requested career assessment. (Ward Dep. I at 93:14-95:25, Ex. 6 (Ward 548 at 3:30).) But Ward refused, claimed that the question was "catchy," and said, if she told her boss "no," it would look bad. (*Id.* at 104:3-107:19, Ex. 6 (Ward 548 at 3:45).)

It did look bad. Later that month, at Ward's mid-year evaluation conference, Lee was disappointed that Ward had refused the assigned task. (*Id.* at 135:18-141:8, 211:13-213:20; Kelly Dec. ¶ 7.) True to form, Ward responded that Lee had only *asked* — not specifically *told* her — to do that task. (Ward Dep. I at 219:10-222:14.) So, on February 8, Lee issued Ward a letter of direction addressing her glaring deficits in communication and professionalism. (*Id.* at 162:5-164:18, Ex. 33.)

**B.   In February 2021, Kelly places a hold on Ward's contract and begins holding weekly meetings to address her job performance deficits.**

That same day, Kelly told CCSD's Executive Director of Employee Relations and Evaluations (Christopher Dowd) about the letter of direction and asked Dowd to place hold on Ward's contract. (Kelly Dec. ¶ 9; Dowd Dec., attached to SMF as **Ex. 5**, ¶ 3.) Dowd did so. (Kelly Dec. ¶ 9; Dowd Dec. ¶ 3.)

On February 9, Kelly and Lee met with Ward to discuss the letter of direction, instruct her to attend weekly review meetings to discuss her deficits in communication and professionalism, and inform her about the contract hold. (Ward

-6-

Dep. I at 166:10-167:25, Ex. 6 (Ward 525), Ex. 34.) In particular, Kelly criticized Ward's communication in the email chain with Huels, saying it was unacceptable for Ward to wait 26 hours to respond to Huels's email. (*See* 2/9/21 Meeting Transcript, attached to SMF as **Ex. 6** at 10:1-17:21.) Defying her bosses yet again, Ward argued there was no CCSD policy explicitly requiring her to respond to emails within 24 hours. (*Id.* at 10:1-17:21.)

At the end of the meeting, Kelly told Ward about the contract hold, explaining that he would review her performance over "the next few weeks" and "if all [was] well," he would recommend that CCSD release her contract. (*Id.* at 21:18-22:2.) Ward became angry and claimed it was all retaliatory — over a month before she ever requested FMLA leave. (*Id.* at 22:7-26:1, 29:23-30:6; Kelly Dec. ¶¶ 10-12;)

## C.   After a few weeks of meetings, Kelly decides to recommend non-renewal.

Kelly and Lee met with Ward to discuss Ward's job performance, on February 26, March 4, March 10, March 12, and March 18, 2021, and they later had her summative evaluation conference on May 18 and 19, 2021. (Kelly Dec. ¶ 18.)[1] The

---

[1] Except for the January 29 meeting with Lee, Ward secretly recorded all her meetings with Kelly and Lee, which she produced at the following Bates numbers and are included on the jump drive attached as Exhibit 6 to her deposition: (i) January 22 (Ward 548); (ii) February 9 (Ward 525); (iii) February 26 (Ward 526); (iv) March 4 (Ward 527 and Ward 528); (v) March 10 (Ward 529); (vi) March 12 (Ward 530 and Ward 531); (vii) March 18 (Ward 532); (viii) May 18 (Ward 533); and (ix) May 19 (Ward 534). (Ward Dep. I at 20:16-24:15, 24:18-10, 168:1-13, Exs. 5, 6.) In its

purpose of the weekly meetings was two-fold: (1) to assess whether Ward showed enough improvement to warrant contract renewal; and (2) to continue improving Ward's job performance deficits as long as she was a HAVEN employee, regardless of contract status for the upcoming school year. (Kelly Dec. ¶ 14.) To put it mildly, the meetings did not go well.[2]

At the meetings on January 29, February 9, February 26, March 4, and March 10, Ward was openly hostile, rude, aggressive, adversarial, and unprofessional. (*Id.* ¶¶ 18-22.) Kelly thought Ward was more cordial at the March 12 meeting, but he still did not see evidence of substantial improvement in the underlying deficits in communication and professionalism. (*Id.* ¶ 23.) On March 18, Kelly thought Ward began the meeting well, but, after he criticized her job performance, she again lapsed into a rude, adversarial posture, leaving Kelly firmly convinced she was not genuinely committed to improvement. (*Id.* ¶¶ 24-25; Kelly Dep. at 40:13-41:12.)

---

SMF, CCSD has attached certified transcripts of each of those audio recordings as Exhibits 4, 6, 7, 8, 9, 10, 11, 12, and 13.

[2] Fortunately, because Ward recorded all the meetings, she cannot dispute what was said or how she behaved at them. Though CCSD has summarized and highlighted certain portions of those meetings in its SMF and brief, it cannot do the meetings justice. Thus, CCSD encourages the Court not only to review the certified transcripts of the meetings but also to listen to the audio recordings to get a fuller sense of Ward's rude, adversarial, and unprofessional tone at the meetings, as well as the revealing comments Ward makes to herself after logging out of the meetings.

That day, Kelly had seen enough, and he decided to recommend non-renewal. (Kelly Dep. at 40:13-42:5; Kelly Dec. ¶ 26.)[3] On April 22, Kelly told Dowd he was recommending non-renewal based on Ward's continued problems with communication and professionalism. (Kelly Dec. ¶ 33.) Because Kelly had a documented, legitimate business reason for the recommendation, Dowd deferred to Kelly's discretion and directed HR to draft a non-renewal letter for Superintendent Ragsdale's signature. (Dowd Dec. ¶¶ 5-7.) Ragsdale signed that letter based solely on HR's recommendation. (Ragsdale Dec., attached to SMF as **Ex. 14**, ¶¶ 3-4.)

On May 12, CCSD sent Ward a notice of non-renewal letter, giving her the option to either: (i) resign in lieu of non-renewal by May 21; or (ii) continue working at CCSD until her contract term expired on May 28. (Dowd Dec. ¶ 8; Ward Dep. II, attached to SMF as **Ex. 15**, at 378:11-379:2, Ex. 54.) Ward did not resign, so she remained under contract with CCSD through May 28. (Dowd Dep. at 68:14-69:11; Ward Dep. II at 394:10-22.)

---

[3] Though Ward's contract status was determined, Kelly still wanted to continue the weekly review meetings because he still needed to see improvement in Ward's job performance during the rest of the school year after she returned from FMLA leave. (Kelly Dec. ¶ 27.) The next weekly meeting had been scheduled for Thursday, March 25, 2021, but after Ward moved up her FMLA leave start date from March 26 to March 25, Kelly postponed the meeting until she returned to work. (*Id.* ¶ 28.)

**D.    After Ward returns from FMLA leave, Kelly and Lee meet with Ward to address her continued performance issues and hold her summative conference.**

After Ward returned from FMLA leave on May 17, Kelly told her to meet with him and Lee the next day to (i) hold the weekly review meeting relating to the March 19-25 period and (ii) have Ward's summative conference, which was required by Georgia law. (Kelly Dec. ¶ 35.) During that meeting, Ward refused to engage, intentionally logged out while Kelly was mid-sentence, and ignored Kelly's multiple invitations to rejoin the meeting. (*Id.* ¶ 36.) On May 19, Kelly and Lee held Ward's summative conference, and Ward again conducted herself in a rude, hostile, unprofessional manner. (*Id.* ¶¶ 37-38.) Based on how Ward conducted herself in those final two meetings, Kelly became concerned that Ward might be a disruptive presence at HAVEN and would not be performing her job duties faithfully. (*Id.* ¶ 38.) So he told Ward to remain at home for the rest of her contract term but that she would continue to be paid. (*Id.* ¶¶ 39-40.)[4]

---

[4] During discovery in this case, CCSD learned that, as a result of a clerical error, Ward's absences from work were mistakenly coded as unexcused, resulting in non-payment for May 20-28, but, upon discovering that mistake, CCSD retroactively paid Ward for those days. (Dowd Dec. ¶¶ 10-11, 13; Kelly Dec. ¶ 39.)

-10-

**E.     Ward immediately lands on her feet with a much higher-paying job.**

Before Ward's last day at CCSD, she accepted a job offer to be a school counselor at Atlanta Public Schools ("APS"), getting a $10,000 salary increase. (Ward Dep. II at 395:16-21; Ward Dep. I at 28:15-29:18, 42:11-43:6, Ex. 8, Ex. 17.) On balance, Ward will earn more working at APS than had she remained at CCSD, based on: (i) her increased salary at APS; (ii) the lack of Social Security deductions at APS; and (iii) the increased value of her Teacher Retirement System of Georgia ("TRS") draw resulting from her increased salary at APS. (October 9 Lundstrom Rep., attached as **Ex. 16**, at 2, 5; *see* Ward Dep. I at 31:2-32:7.)

## III.     MEMORANDUM OF LAW.

Under the FMLA, an "eligible employee" is entitled to up to twelve weeks of leave during which her job status is protected. *O'Connor v. PCA Fam. Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000) (citing 29 U.S.C. § 2614). The "employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period." 29 C.F.R. § 825.216(a). The employer may not discharge the employee for taking FMLA leave. *O'Connor*, 200 F.3d at 1352 (citing 29 U.S.C. § 2615(a)(2)). If that happens, the employee may sue the employer for FMLA retaliation. 29 U.S.C. § 2617(a)(1).

To prevail on a retaliation claim, a technical violation of the FMLA is not enough. *Ramji v. Hospital Housekeeping Sys.*, LLC, 992 F.3d 1233, 1241 (11th Cir. 2021). The employee instead must prove the violation caused her harm or prejudice for which the statute has a remedy: *i.e.*, damages or equitable relief. *Id.* If the employee has no viable remedy for the alleged violation, the employer is entitled to summary judgment. *Aponte v. Brown & Brown of Fla., Inc.*, 806 F. App'x 824, 828 (11th Cir. 2020).

For two main reasons, CCSD is entitled to summary judgment[5] on Ward's FMLA claims. First, she cannot prove retaliatory causation, because CCSD had legitimate, non-retaliatory, non-pretextual reasons for non-renewing her contract. Next, her claim also fails because she has no viable FMLA remedy.

---

[5] A party is entitled to summary judgment if it shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact requires "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The movant "bears the initial responsibility" of identifying record evidence supporting his position. *Celotex Corp.*, 477 U.S. at 323. If it does so, the burden shifts to the non-movant to go beyond the pleadings and present specific record evidence of a genuine, material factual dispute. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324-26. "A fact is 'material' if it might affect the outcome of the suit under the governing law." *Richmond v. Badia*, 47 F.4th 1172, 1179 (11th Cir. 2022). And a factual dispute "is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

PPAB 10492559v3

A.     **Ward cannot show retaliatory causation.**

CCSD is entitled to summary judgment because no reasonable juror could find that Ward's FMLA leave motivated the nonrenewal decision. When employees (as here) rely on circumstantial evidence to prove FMLA retaliation, courts generally analyze the claim under the Title VII burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Batson v. Salvation Army*, 897 F.3d 1320, 1328-29 (11th Cir. 2018). Under that framework, the employee first must establish a prima facie case of retaliation by showing three elements: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally related to the protected activity. *Id.* at 1329. An employee satisfies the first two elements by showing that she took FMLA leave and was fired after returning. *Fonte v. Lee Mem. Health Sys.*, No. 20-13240, 2012 WL 5368096, *5 (11th Cir. Nov. 18, 2021).

To prove the third element, the employee must show that the protected leave was the but-for cause of the adverse employment action. *Id.* at *4-5 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). At the prima facie stage, the employee can show retaliatory causation if there is "very close" temporal proximity between the protected activity and the adverse action. *Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1295 (11th Cir. 2021).

-13-

If the employee makes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *Aponte*, 806 F. App'x at 829. If the employer does so, the burden shifts back to the employee to show that the proffered reason was pretextual. *Matamoros v. Broward Cnty. Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021). The employee cannot show pretext with temporal proximity alone. *Tolar*, 997 F.3d at 1299 and n.6.

For that reason, Ward loses. For purposes of summary judgment only, CCSD concedes that Ward can make a *prima facie* case under the *McDonnell Douglas* framework, given the temporal proximity between her protected activity and Kelly's non-renewal decision. But that temporal proximity is not enough to survive summary judgment, because CCSD had legitimate, non-retaliatory, non-pretextual reasons for non-renewing Ward's contract. *See Tolar*, 997 F.3d at 1299 and n.6.

### i.    CCSD's legitimate, non-retaliatory reasons for non-renewal.

An employer may fire an employee for any reason as long as it is not an unlawful reason. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). Thus, to rebut a prima facie inference of retaliation, the employer need only proffer evidence of a lawful reason for the challenged action. *Meeks v. Computer Assocs. Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994). This burden is one of production—not persuasion—and is "exceedingly light." *Id.* The employer need not convince the

-14-

court of its motivations. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). Rather, it need only show that a reasonable juror could find it did not unlawfully retaliate. *Id.*

CCSD easily carries this intermediate burden, given Ward's glaring deficits in communication and professionalism. Those job performance issues created friction with her co-workers and needlessly consumed the time and energy of her administrators. When given the opportunity to save her job, Ward continued to have a bad attitude and defy her bosses. These persistent problems were more than enough to motivate the non-renewal decision, negating any prima facie inference of retaliation. *See Chapman v. Al Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). The burden therefore shifts back to Ward to show that CCSD's proffered reasons were pretextual. *Id.* As discussed below, she cannot.

**ii.    Ward cannot show pretext.**

To withstand summary judgment, the plaintiff must show that each of the employer's proffered reasons is pretextual. *Id.* at 1024-25. To show pretext, the plaintiff must show "*both* that the reason was false, *and* that [retaliation] was the real reason." *Springer v. Convergys Customer Mmgt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original). The plaintiff may not simply "recast an employer's proffered nondiscriminatory reasons or substitute her business judgment

-15-

for that of the employer." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (cleaned up). Instead, she must show that the proffered reason is so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable juror could find it "unworthy of credence." *Id.* If the proffered reason "might motivate a reasonable employer," the plaintiff "must meet that reason head on and rebut it. . . ." *Id.* The plaintiff loses by "simply quarreling with the wisdom" of the decision. *Id.*

The pretext stage "centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head." *Id.* at 1266. Given that employer-centric inquiry, courts must "be careful not to allow [FMLA] plaintiffs simply to litigate whether they are, in fact, good employees." *Id.* Courts should not evaluate whether an employer's explanation for an adverse action is correct, only "whether it is an honest one." *Rojas v. Florida*, 285 F.3d 1339, 1339 (11th Cir. 2002). For that reason, an employee cannot create an issue of material fact by relying on her subjective belief about the reasonableness of her conduct or a self-serving account of her professional interactions. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004), *abrogated on other grounds recognized by Lewis I*, 918 F.3d at 1218 (en banc).

Though temporal proximity might be enough to show causation at the *prima facie* stage, it is insufficient, by itself, to show pretext. *Tolar*, 997 F.3d at 1299 and n.6; *Connelly v. WellStar Health Sys., Inc.*, 758 F. App'x 825, 832 (11th Cir. 2019). And a plaintiff cannot move the needle further with speculative assertions of retaliatory motive. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018).

At the pretext stage, Ward comes up empty-handed. All pertinent decisionmakers have said, under oath, that Ward's FMLA activity played no part in their decisions. (Ragsdale Dec. ¶¶ 3-4; Dowd Dec. ¶¶ 12-13; Kelly Dec. ¶ 40.) Ward cannot genuinely dispute that sworn testimony with conclusory accusations of retaliatory motive or by second-guessing Kelly's business judgment. *See Alvarez*, 610 F.3d at 1265. The only evidence Ward has is the temporal proximity between her protected activity and Kelly's non-renewal decision. But that is not enough to create a jury question on the pretext issue. *See Tolar*, 997 F.3d at 1299 and n.6.

Nor can Ward show any uneven treatment among other employees who did not take FMLA leave. Ward cannot point to any other materially similar employee (i) with the same job performance issues and bad attitude that Ward had (ii) who received more favorable disciplinary treatment from Kelly, Dowd, or Superintendent Ragsdale. (*See* Pl's Supp. Interr. Resp., attached hereto as **Ex. 1** at No. 8.) At most,

-17-

Ward claims Wesselmann received more favorable treatment, but she has no evidence suggesting that Wesselmann had the same glaring deficits in communication and professionalism, much less that Wesselmann waged an openly hostile campaign of defiance toward her administrators, as Ward did. (*See generally id.*) For that matter, Ward's claim that Wesselmann was treated better has nothing to do with whether she engaged in protected activity under the FMLA. Ward thinks Wesselmann was treated better because of Wesselmann's race, but she has no evidence to support that accusation. (Ward Dep. II at 432:21-434:2.)

In short, Ward cannot show that either CCSD's proffered reasons for the non-renewal decision were false, or her FMLA activity was the real reason for non-renewing her contract. CCSD is therefore entitled to summary judgment.

**B.      Ward has no viable FMLA remedy.**

Even if Ward could show retaliatory causation, her FMLA claim still fails because she cannot prove actual damages. *See Aponte*, 806 F. App'x at 828. Under subsection (I) of 29 U.S.C. § 2617(a)(1)(A)(i), an employee may seek lost compensation. Alternatively, if the employee does not seek lost compensation, subsection (II) allows her to seek damages for other monetary losses "sustained . . . as a direct result of the violation" at issue, up to an amount equal to "12 weeks" of the employee's salary. 29 U.S.C. § 2617(a)(1)(A)(i)(II) (emphasis added). If the

-18-

plaintiff claims lost compensation, her claim falls under subsection (I), precluding any claim for non-compensatory monetary losses under subsection (II). *Jadwin v. Cnty. of Kern*, No. 07-CV-0026-OWW-DLB, 2010 WL 1267264, at \*10 (E.D. Cal. Mar. 31, 2010).[6]

Under either provision, "The damages recoverable are strictly defined and measured by actual monetary losses. . . ." *Nev. Dep't of Hum. Resources v. Hibbs*, 538 U.S. 721, 740 (2003). Because the plaintiff must show an actual loss, nominal damages and emotional distress damages are not recoverable. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1284 (11th Cir. 1999); *Billups v. Tampa Sports Auth.*, No. 8:06-cv-1433-T-23TGW, 2007 WL 4093232, at \*9 and n.9 (M.D. Fla. Nov. 15, 2007) (collecting cases).

Since Ward does not seek reinstatement or other non-monetary forms of equitable relief [*see* Doc. 1 at 13], she must prove actual damages to survive summary judgment. *See Aponte*, 806 F. App'x at 828. To create a jury question on damages, an employee must present evidence from which a reasonable juror could

---

[6] Liquidated damages are available only if the employee can prove actual damages. *See* 29 U.S.C. § 2617(a)(1)(A)(iii) (permitting, in the case of willful violations, "additional liquidated damages equal to the amount of the compensatory damages."). And litigation expenses (including attorney's fees, expert fees, and other costs) are not recoverable unless the employee prevails on her underlying claim. *See* 29 U.S.C. § 2617(a)(3).

determine the amount of any lost wages or fringe benefits she seeks. *Cf. Wai v. Fed. Exp. Corp.*, 461 F. App'x 876, 886 (11th Cir. 2012) (vacating nearly 80% of damages award because jury lacked evidentiary basis for awarding back pay, health insurance, and 401(k) benefits). An employee may not simply speculate about the value of a lost benefit. *Id.*

Ward seeks only four categories of alleged damages that either legally erroneous or unduly speculative: (1) lost opportunity costs or leisure time; (2) increased commuting costs for her new job at APS; (3) diminished future social security earnings; and (4) lost salary payments (back pay). None of those measures of damages is viable.

### i.    Ward may not recover damages for having less free time at APS.

Ward may not recover damages for "lost opportunity cost" or "lost leisure time" because there was no monetary loss associated with it. The FMLA only allows damages for "actual monetary losses." *Hibbs*, 538 U.S. at 740. Though Ward's expert has held that Ward should be compensated for lost "opportunity cost" or "leisure time" resulting from Ward working 12 more days per year at APS (Yoruk Rep., attached as **Ex. 2**, at 8-9),[7] Ward has shown no monetary loss from that

---

[7] At APS, Ward works 12 more days each year than she did at CCSD. Dr. Yoruk describes this 12-day difference as a loss of "leisure time" or "opportunity cost." (Yoruk Rep. at 9.) He places a monetary value on that lost free time by reducing

increased workload.[8] For instance, she has not shown that, while working at CCSD, she had a part-time job or supplemental source of income that she could no longer maintain because of her longer work schedule at APS. (*See* Ward Dep. II at 395:22-397:4.) She simply complains that APS requires her to work more days than CCSD did. The FMLA does not allow recovery for having less free time. *See Hibbs*, 538 U.S. at 740.

### ii.    Ward may not recover damages for increased commuting costs.

For four reasons, this Court should grant summary judgment on Ward's claim for increased commuting expenses. First, her claim for lost compensation under § 2617(a)(1)(A)(i)(I) precludes any claim for non-compensatory monetary losses under § 2617(a)(1)(A)(i)(II). Second, even if Ward could maintain a claim under subsection (II), her claim for increased commuting expenses is too indirect to be recoverable. Third, subsection (II) also does not permit damages on a forward-looking basis. Finally, any recovery under subsection (II) would be capped at $17,149.85--far less than the $200,015 she now claims.

---

Ward's APS salary by 12 days and then comparing that adjusted amount to what her full salary would have been at CCSD. (*Id.* at 8-9.)

[8] Furthermore, for the reasons explained in CCSD's Daubert Motion, this Court should exclude Dr. Yoruk's opinions altogether.

### a.   Ward's claim for lost compensation precludes any claim for non-compensatory monetary losses.

For a plaintiff to recover damages under the FMLA, she must show actual monetary losses under 29 U.S.C. § 2617(a)(1)(i). *Hibbs*, 538 U.S. at 740. That statute allows damages for either: (1) lost compensation under subsection (I); ***or*** (2) other non-compensatory monetary losses under subsection (II). *See* 29 U.S.C. §§ 2617(a)(1)(A)(i)(I)-(II). Because those damages subsections are written in the disjunctive ("or" versus "and"), the remedies are not cumulative. *See Jadwin*, 2010 WL 1267264, at *10. The FMLA effectively requires plaintiffs to select their remedy. *See id.* So if a plaintiff claims lost compensation, her damages remedy is limited to subsection (I). *Id.*

Because Ward seeks lost compensation, she cannot simultaneously maintain a claim for non-compensatory monetary losses, including her claim for increased travel expenses discussed in Dr. Yoruk's report. In her Complaint, Ward alleges she lost only "wages, salary, employment benefits" and "other compensation." [Doc. 1 ¶ 70; *id.* at 13.] She alleges no form of monetary loss other than lost compensation. [*See generally id.*] Ward has therefore chosen the "lost compensation" remedy under § 2617(a)(1)(A)(i)(I), precluding recovery for other forms of alleged monetary losses under § 2617(a)(1)(A)(i)(II). *See Jadwin*, 2010 WL 1267264, at *10.

-22-

### b.   Ward's alleged increased travel expenses are too indirect.

Even if Ward could maintain a claim under § 2617(a)(1)(A)(i)(II), her travel expenses costs are too indirect to be recoverable. Section 2617(a)(1)(A)(i)(II) limits recovery to actual monetary losses that *directly* resulted from the FMLA violation. To illustrate, the FMLA provides that, if an employee is wrongfully denied leave to take care of a sick relative, the employee may recover the costs they incur in "providing care" to that relative. *Id.* So if the employee must hire a home nurse to take care of her sick relative (instead of taking care of the relative herself while on FMLA leave), the employee may recover those costs. *Id.*

Without such a direct, causal relationship, the employee may not recover damages for other monetary losses. *See Billups*, 2007 WL 409232, at *9. For instance, in *Billups v. Tampa Sports Auth.*, the plaintiff claimed that the employer's denial of FMLA leave forced her to work while disabled, exacerbating her medical conditions, thereby causing her to incur medical expenses to treat those worsened conditions. *Id.* The court found those increased medical expenses too attenuated to be recoverable. *Id.*

Ward's case bears no similarity to the FMLA's statutory hypothetical, which contemplates a situation in which the employee necessarily incurs damages directly because the employer prevented her from taking FMLA leave. *See* 29 U.S.C.

§ 2617(a)(1)(A)(i)(II). Ward does not claim that CCSD interfered with her FMLA leave. [*See generally* Doc. 1.] She instead complains that she has incurred more expenses commuting to her new job at APS. (*See* Ward Dep. II at 395:22-397:4.)

But those alleged expenses are, at best, an *indirect* result of her contract non-renewal. The causal chain depends on many variables that can (and almost certainly will) change over the forward-looking eighteen-year period for which Ward claims these expenses. APS might reassign Ward to a closer job next year. Or she might leave APS altogether. Or she might move closer to work. In other words, Ward's own choices are contributing, intervening causes for her current commuting distance, making her alleged, increased travel expenses too attenuated to be recoverable under 29 U.S.C. § 2617(a)(1)(A)(i)(II).

### c.  Ward cannot recover for future, non-compensatory losses.

The plain language of the FMLA limits recovery of non-compensatory monetary losses only to past damages. Subsection (II) of the damages provision allows recovery for "actual monetary losses *sustained* by the employee as a direct result" of the employer's FMLA violation. 29 U.S.C. § 2617(a)(1)(A)(i)(II) (emphasis added). Written in the past-tense, the plain language of the statute contemplates only past monetary losses — not future losses. *See id.* That statutory

-24-

language precludes any recovery of forward-looking damages based on Ward's alleged future commuting costs. *See id.*[9]

### d.     Any claim for non-compensatory monetary losses would be capped at $17,149.85.

Even if Ward could recover damages for increased commuting costs, those damages would be statutorily capped at $17,149.85. Under 29 U.S.C. § 2617(a)(1)(A)(i)(II), an employee may only recover non-compensatory monetary losses "up to" 12 weeks' salary. *See also* 29 C.F.R. § 825.400(c). Had CCSD renewed Ward's contract for the 2021-2022 school year, her annual salary would have been $74,316. (*See* 2021-22 CCSD Teacher Pay Scale, attached to Defendant's Motion to Exclude Testimony by Dr. Baris Yoruk and Memorandum of Law in Support (the "Daubert Motion") as **Ex. 3** filed contemporaneously). Twelve weeks of salary payments would have totaled $17,149.85.[10] Thus, even if Ward had a viable claim for damages under § 2617(a)(1)(A)(i)(II), those damages would be capped at $17,149.85.

---

[9] And because commuting time is obviously not an "employment benefit" or form of "other compensation," Ward's future commuting costs would not be recoverable as an item of front pay under the FMLA's provision authorizing equitable relief (29 U.S.C. § 2617(a)(1)(B)). *Moncrief v. Federal-Mogul Powertrain LLC*, No. No. 5:20-cv-01215-HNJ, 2022 WL 1405417, at *18 (N.D. Ala. Mar. 30, 2022).

[10] There are 52 weeks in a year. $74,316 \times \frac{12}{52} = \$17,149.85$.

### iii.    Ward's front-pay claim for the diminished value of future social security earnings is improper, unduly speculative, and erroneous.

This Court should also grant summary judgment on Ward's front pay claim for the alleged, diminished value of her future social security earnings. Under 29 U.S.C. § 2617(a)(1)(B), an employee may seek equitable relief for an FMLA violation, including front pay in lieu of reinstatement. *Evans v. Books-A-Million*, 762 F.3d 1288, 1297 (11th Cir. 2014). But "because of the potential for windfall, the use of front pay must be tempered." *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992) (cleaned up). It is "not intended to insure a plaintiff's future financial success." *Reiner v. Family Ford, Inc.*, 146 F. Supp. 2d 1279, 1290 (M.D. Fla. 2001). Front-pay awards must be "grounded in available facts, acceptable to a reasonable person and not highly speculative." *Downes v. Volkswagen of Am.*, 41 F.3d 1132, 1141 (7th Cir. 1994). Courts must also consider whether the employee has found another job. *Carl v. Fulton Cnty., Ga.*, No. 1:07-CV-1812-AJB, 2013 WL 12357465, *6 (N.D. Ga. Mar. 31, 2013).

This Court should grant summary judgment on Ward's front-pay claim (*i.e.*, diminished, future, social security earnings). First, because social security is not a recoverable "employment benefit" under the FMLA, it is not a proper measure of front pay. Second, even if Ward could theoretically recover for the alleged diminished value of her future social security earnings, her proposed front-pay

period (18 years) is unduly speculative. And third, her calculation of the social security earnings is based on erroneous methodology.

### a. Ward may not recover for diminished social security earnings.

Diminished social security earnings are not recoverable as an item of lost compensation under 29 U.S.C. § 2617(a)(1)(A)(i)(I). That provision allows recovery of lost compensation, including salary and "employment benefits." 29 U.S.C. § 2617(a)(1)(A)(i)(I). When interpreting a statutory term (like "employment benefits"), courts first look to the plain language of the statute. *See In re BFW Liquidation, LLC*, 899 F.3d 1178, 1189-90 (11th Cir. 2018); *McAnnally v. Wyn S. Molded Prods., Inc.*, 912 F. Supp. 512, 513 (N.D. Ala. 1996) (analyzing plain language of FMLA's remedial provision). "Where Congress has provided a comprehensive statutory scheme of remedies, as it did here," courts also apply "the interpretive canon of *expressio unius est exclusio alterius*," which says that a list of related items implies the exclusion of unlisted items. *See Christian Coal. of Fla., Inc. v. U.S.*, 662 F.3d 1182, 1193 (11th Cir. 2011). These two canons of statutory construction confirm that Congress did not intend to define "employment benefits" broadly enough to encompass future social security retirement earnings.

Begin with the plain language. The FMLA defines "employment benefits" as "all benefits provided or made available to employees *by an employer*, including

group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions. . . ." 29 U.S.C. § 2611(5) (defining "Employment benefits") (emphasis added). Since social security benefits are provided by the Social Security Administration — and not "by an employer" — they do not meet that statutory definition. *See* 42 U.S.C. § 901(b) ("It shall be the duty of the [SSA] to administer the old-age . . . insurance program under subchapter II. . . ."); 42 U.S.C. § 402(a) (discussing eligibility for old-age insurance benefits).

In line with that plain language, the FMLA does not list social security as an example of "employment benefits." *See generally* 29 U.S.C. § 2611(5). The examples it does give are limited to various forms of leave, private insurance, educational benefits, and pensions. *Id.* Social security retirement benefits fall under none of those categories. That list of specific examples implies the exclusion of others, such as social security. *See Christian Coalition of Fla.*, 662 F.3d at 1193.

Because social security earnings are not an "employment benefit" under the FMLA, Plaintiff may not recover damages for the alleged diminished value of her future social security earnings.

### b.   Ward's proposed front-pay period is too speculative.

Though front pay awards are necessarily based on future projections, they cannot be "unduly speculative." *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366,

1372 (7th Cir. 1992). "The longer a proposed front pay period, the more speculative damages become." *Id.* "[C]ourts have consistently refused to award front pay until retirement or for otherwise lengthy periods because such awards would be unduly speculative." *Anderson v. City of Ft. Pierce*, No. 14-14095-Civ-Martinez/Brannon, 2017 WL 11680181, at *2 (S.D. Fla. May 2, 2017) (collecting cases); *see, e.g.*, *Dotson v. Pfizer*, 558 F.3d 284, 300 (4th Cir. 2009) (fifteen years too speculative); *United Paperworkers Intern. Union, AFL-CIO, Local 274 v. Champion Intern. Corp.*, 81 F.3d 798, 805 (8th Cir. 1996) (twenty-four years too speculative); *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1056 (7th Cir. 1990) (five years too speculative); *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984) (more than four months too speculative); *Snow v. Pillsbury Co.*, 650 F. Supp. 299, 300 (D. Minn. 1986) (nine years too speculative).

And an employee's work history also has bearing on the reasonableness of a front-pay period. *See Armstrong v. Charlotte Cnty. Bd. of Cnty. Com'rs*, 273 F. Supp. 2d 1312, 1317 (M.D. Fla. 2003). For instance, in *Armstrong v. Charlotte County Board of County Commissioners*, the court found that a six-year front pay period was too speculative, given the plaintiff had only worked two and a half years with the defendant. *Id.*

PPAB 10492559v3

So too here. Ward claims that, had she kept working at CCSD (which participates in social security), the value of her future social security earnings would be greater than they will be if she keeps working at APS (which does not participate in social security). In seeking the diminished value of future social security benefit, she asks this Court to assume she will work *eighteen* years at APS before retiring. (*See* Ward Dep. II at 395:22-396:20.) That assumption is far too speculative to support a front-pay award. *See Anderson*, 2017 WL 11680181, at *2.

On top of that, nothing about Ward's employment history suggests she would have remained a CCSD employee if given the opportunity. Ward only moved to the Atlanta area in mid-2018. (Ward Dep. I at 28:2-20.) During the 16 years before that, she had (i) lived in four different cities in South Carolina, and (ii) worked for five different employers. (*See* Ward Dep. I at 27:3-28:20, Ex. 7.)[11] Her average period of employment with each of those employers was only about three years, and she never worked anywhere longer than six years. (*See* Ward Dep. I at Ex. 7.)

If anything, that transient work history suggests that Ward's days at CCSD were numbered, even if CCSD had renewed her contract. Beyond Ward's self-

---

[11] And given the physical distance between those four cities (Columbia, Rock Hill, Bishopville, and Manning), we can also infer that Ward must have moved for most (if not all) of her jobs. For instance, her resume notes that, during her employment with the South Carolina Department of Mental Health, she was transferred from Rock Hill, SC to Manning, SC (about two hours away). (*See* Ward Dep. I at Ex. 7.)

serving conjecture, there is nothing to suggest she would have stayed with CCSD for another eighteen years. Because Ward's temporal assumptions are too speculative, this Court should grant summary judgment on the claim.

### c.      Ward's social security calculation is erroneous.

Putting aside the speculative nature of Ward's proposed front-pay period, her valuation of the future social security benefit is simply wrong. When a person eventually becomes eligible to draw social security, the amount of their earnings is based on a specific formula used by the Social Security Administration ("SSA").[12] The SSA computes the benefit "using average indexed monthly earnings," based on "up to 35 years of a worker's indexed earnings."[13] *Id.* In other words, the amount of the benefit has nothing to do with the amount of employer/employee social security contributions, which are nothing but a federal payroll tax (*i.e.*, FICA taxes).[14]

Ward fails to grasp this point with the damages models she presented during discovery. In her initial disclosures, she claimed $91,566 in lost social security benefits, by multiplying the amount of CCSD's 6.2% social security contribution by

---

[12] *Social Security Benefit Amounts*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/oact/cola/Benefits.html (last visited December 14, 2023).
[13] *Id.*
[14] *See id.*; *What is FICA?*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/people/materials/pdfs/EN-05-10297.pdf (last visited December 14, 2023).

eighteen years. (*See* Pl's Init. Discl., attached as **Ex. 4** to Daubert Motion, No. 6.) But that is not how social security benefits are calculated. CCSD's social security contributions were "not held in a personal account for [Ward] to use when [she] get[s] benefits."[15] In other words, social security benefits do not work like a 401(k) plan. Because Ward essentially confused FICA taxes for 401(k) contributions, her damages model is fatally flawed and cannot support recovery.[16]

### iv.   Ward's higher salary at APS fully mitigates her alleged losses.

CCSD also deserves summary judgment because Ward's increased compensation at APS fully offsets her alleged damages. For both front pay and back pay claims, employees must mitigate their damages by searching for comparable employment. *Mattenson v. Baxter Health Corp.*, 438 F.3d 763, 771 (7th Cir. 2006). If a fired employee gets a new job, her compensation from that job "will, of course, limit the amount of front pay available." *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988). The same is true for backpay awards. *See Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1472 (11th Cir. 1988) (trial court erred by failing to

---

[15]     *What is FICA?*, SOCIAL SECURITY ADMINISTRATION, https://www.ssa.gov/people/materials/pdfs/EN-05-10297.pdf (last visited December 14, 2023).

[16] In light of Dr. Yoruk's opinions, it is unclear whether Ward stands by this earlier damages calculation. But unless she explicitly abandons that theory of recovery, this Court should grant summary judgment on it.

deduct interim earnings from what plaintiff would have earned with the defendant-employer). And if the employee seeks damages for a lost benefit, courts also must deduct any premiums, deductibles, or employee contributions the employee would have paid to earn that benefit with the prior employer. *Stevens v. ACR Sales and Serv., Inc.*, No. 608CV421ORL31KRS, 2009 WL 10670163, at *5 (M.D. Fla. Jan. 14, 2009), *report and recommendation adopted,* No. 608CV421ORL31KRS, 2009 WL 10670065 (M.D. Fla. Feb. 4, 2009).

Putting aside all liability issues, Ward has no FMLA claim, because she is fortunate enough to have fully mitigated her alleged losses. Though Ward's last contract day at CCSD was May 28, 2021, she continued to receive paychecks from CCSD through July (her summer pay). Before her last day at CCSD, she took a new job at APS, getting a $10,000 raise in the process. Since Ward began at APS in mid-August, she had only a half-month gap in pay. By the end of the year, her higher salary payments at APS fully offset — and surpassed--that short pay-gap. Ward therefore has no back-pay claim. (*See* October 9 Lundstrom Rep. at 2.)

Ward also cannot show a net loss based on APS's non-participation in social security. That theory of damages depends on two generous assumptions: (1) that, but for Ward's contract non-renewal, she would have remained employed at CCSD for the next eighteen years; and (2) that Ward will now remain at APS (in non-social-

security-covered employment) until retirement. As discussed in Section III.B.iii.b. above, those assumptions are far too speculative, especially given Ward's transient work and residency history. But as Dr. Lundstrom has shown, even if this Court indulges that speculation, Ward is financially *better off* because of her separation from CCSD. (October 9 Lundstrom Rep. at 5.)

There are three reasons for this result. First, Ward gets a significantly higher salary than she would have made at CCSD, even with CCSD salary increases under later pay scales. Second, because of that higher salary, the value of Ward's TRS benefit is greater than it would have been had she remained at CCSD. And third, Ward no longer pays social security taxes out of her paycheck — effectively a 6.2% pay raise in its own right. On balance, those three improvements in her compensation fully offset the alleged diminution of Ward's future social security earnings. (October 9 Lundstrom Rep. at 5.)

At bottom, the undisputed evidence shows that, right after her separation from CCSD, Ward not only landed on her feet but also improved her financial situation. She fell *up*. Because her alleged damages (past and future) are fully mitigated, she can show no monetary loss. She therefore has no viable remedy under the FMLA, and CCSD deserves summary judgment.

-34-

## IV.   CONCLUSION.

For all these reasons, the Court should grant CCSD's summary judgment

motion.

This 5th day of February 2024.

/s/ Jeffrey R. Daniel

Jeffrey R. Daniel

GA Bar No. 949075

*Counsel for Defendant*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE
Suite 1500
Atlanta, GA 30309
678.690.5750
jeffdaniel@parkerpoe.com

Nana Asante-Smith
Admitted *pro hac vice*

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street
Raleigh, NC 27602
919.828.0564
nanaasantesmith@parkerpoe.com

-35-

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This 5th day of February 2024.

/s/ Jeffrey R. Daniel
Jeffrey R. Daniel
GA Bar No. 949075
*Counsel for Defendant*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE
Suite 1500
Atlanta, GA 30309
678.690.5750
jeffdaniel@parkerpoe.com

Nana Asante-Smith
*Admitted pro hac vice*

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street
Raleigh, NC 27602
919.828.0564
nanaasantesmith@parkerpoe.com

-36-

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day I filed the within and foregoing DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT with the Clerk of Court by using the CM/ECF system, which will send electronic notification of such filing to the following:

> Jackie Lee, Esq.
> LEE LAW FIRM, LLC
> 695 Pylant Street NE
> Suite 105
> Atlanta, Georgia 30306
> jackie@leelawga.com

This 5th day of February, 2024.

> /s/ Jeffrey R. Daniel
> Jeffrey R. Daniel (GA Bar No. 949075 )
> *Counsel for Defendant*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE
Suite 1500
Atlanta, GA 30309
678.690.5750
jeffdaniel@parkerpoe.com

> Nana Asante-Smith (*Admitted pro hac vice*)

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street
Raleigh, NC 27602
919.828.0564
nanaasantesmith@parkerpoe.com