## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

DERHONDA WARD,

     Plaintiff,

v.

COBB COUNTY SCHOOL
DISTRICT,

     Defendant.

CIVIL ACTION NO.
1:22-cv-04453-SDG-RDC

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

---

COMES NOW Plaintiff, DeRhonda Ward ("Plaintiff"), by and through her undersigned counsel, submits the following Response in Opposition to Defendant's Motion for Summary Judgment. Plaintiff respectfully shows this Court as follows:

## I.   INTRODUCTION.

This is not a summary judgment case. To the contrary, there is an incredible amount of evidence showing that Defendant Cobb County School District ("CCSD")'s reason for not renewing Plaintiff's contract was pretext for FMLA retaliation. First, the evidence shows that there was a mere **two days** between when Plaintiff made a complaint of FMLA retaliation and when Dr. Isaac Kelly, Principal, made the non-renewal decision and a mere **nine days** between

1

when Kelly signed Plaintiff's FMLA paperwork and when he made the non-renewal decision.

Second, Plaintiff has presented evidence that soon after Kelly became aware of Plaintiff's need for leave, he immediately began to pile a significant amount of unnecessary work on her plate—work that had been exempted both by the Georgia Department of Education and the counseling department.

Third, Kelly told Plaintiff in a March 4, 2021 weekly meeting that he would not make the decision as to whether or not to release her contract until the district sent him an email in May asking whether he wanted to release her contract. However, Kelly did not give Plaintiff that benefit. Kelly now testifies that he made the decision on March 18 the last weekly meeting Plaintiff had prior to beginning her FMLA leave.

Additionally, there is a substantial amount of evidence from which a jury could conclude that Kelly took an unusual amount of interest in finding out more information about Plaintiff's FMLA leave—including emailing the benefits department asking about their communications with Plaintiff regarding her leave and continuing to counsel Plaintiff on her failure to notify him of the need to change the dates of her leave—despite the fact that her contract status had already been determined.

Finally, the manner in which Plaintiff was treated following her leave is further evidence of pretext. Plaintiff was told she was no longer allowed on the property despite not having done anything, was told she had to return her laptop which meant she could not perform any work for CCSD, and was not paid for any day past May 20, 2021 (until over two years later during discovery) despite her official letter of non-renewal stating that her employment would end on May 28, 2021. Again, this is not a summary judgment case.

## II.    FACTUAL BACKGROUND.

### Plaintiff's Employment at Cobb County School District ("CCSD")

In July 2018, Plaintiff began her employment with CCSD as a GNETS Counselor at H.A.V.E.N. Academy at Sky View which has students from kindergarten all the way to the age of 22. (Ward Dep. I, **Ex. A**[1], 28:15-17; Kelly Dep., **Ex. C,** 13:13-14:8). Plaintiff was the sole counselor at H.A.V.E.N. which made her job more challenging than the role of a counselor at other schools as she had to navigate the requirements of elementary, middle, and high school students. (Ward Dep. I 88:15-89:19, 413:13-414:17; Marsh Dep., **Ex. D,** 88:22-89:18). For the 2020-2021 school year, Plaintiff had a reporting relationship to Dr. Debra Lee, Assistant Principal and Dr. Isaac Kelly, Principal. (Kelly Dep. 17:20-18:2, 20:1-21:1). Plaintiff also had the CCSD School Counseling Department, including

---

[1] All deposition transcripts, exhibits, and declarations are attached to Plaintiff's Appendix to Her Response in Opposition for Defendant's MSJ.

Melissa Marsh, Supervisor of School Counseling, Advisement, and Crisis Response, and Alexandra Huguelet, School Counseling Consultant, as a resource she could go to if she had questions or needed additional support. (Marsh Dep. 15:7-18:5, 85:10-25).

## Career Assessments Are Waived for the 2020-2021 School Year Due to the Stress of the Pandemic on Counselors

The Georgia Department of Education (GaDOE) suspended Bridge Law requirements for FY 2021 due to the COVID-19 pandemic. (Dr. Kelly Dep. 107:20-109:19, Ex. 20; Marsh Dep. 30:7-37:1, Ex. 1). On January 11, 2021, Marsh sent an email with the title "Relief" to all counselors at CCSD stating that since counselors are "more overwhelmed than ever" and the counseling department wanted to offer as much relief as possible, they would not be "following up, submitting, or checking on the Middle School or High School Law Bridge Law requirements for the 2020-2021 school year." *Id.*

The Bridge Law requirements require that every middle and high school student receive lessons on "college and career readiness" so that they are prepared when they graduate high school; there are no Bridge Law requirements for elementary school students. (Marsh Dep. 33:14-34:17). In a normal year where the Bridge Law requirements have not been waived, counselors at CCSD are responsible for completing "career assessments" for middle and high school

students to fulfill the "college and career readiness" piece of the Bridge Law requirements.  (Marsh Dep. 33:14-34:17, 42:12-24, 52:9-54:4, Ex. 3).

On January 13, 2021, a series of emails were exchanged between Plaintiff and Nancy Wesselmann, Lead Teacher, with the title "CR [student initials] Transition Interview" where Wesselmann was directing Plaintiff to assist with a student's transition interview for the transition plan.  (Marsh Dep. 42:12-24, Ex. 3). All students at H.A.V.E.N. have an individualized education program ("IEP"), but a transition plan is only part of an IEP when a student is turning 14 or in 8th grade and only when there is some sort of transition from elementary to middle school, middle to high school, or high school to post-secondary.  (Kelly Dep. 53:20-55:9; Marsh Dep. 45:14-49:11).

Plaintiff was asked by Katrina Huels, Program Supervisor, to seek clarification from "an administrator in the School Counseling Department to clarify the transition plan process" so Plaintiff sent an email to Huguelet, who reports to Marsh.  (Marsh Dep. 42:12-24, Ex. 3).  Huguelet responded and stated that the transition interview is "not something that a counselor would administer" and also stated that counselors administer career assessments to fulfill Bridge Law but "**not as a function of providing information for a student's transition plan,**" and that because the Bridge Law requirements were waived this year, it "**is not guaranteed that the results of these assessments will be available for them**

**to utilize."** *Id.* (emphasis added).   Counselors are not trained in preparing a transition plan for an IEP.  (Marsh Dep. 65:8-66:16, Ex. 8)

Huels forwarded the email correspondence between herself, Plaintiff and Wesselmann to Kelly for his review; Kelly responded that he understood why Plaintiff had questions as Wesselmann mentioned IEP items which are not a counselor's responsibility and stated in a second email that "My view is this . . . if someone sends me an email asking me to get started on something that is not [sic] responsibility and using terms under that I am not familiar with, I would have questions too.  I could be wrong—but I believe each of us would have questions. . ."  (Kelly Dep. 79:10-81:4, Ex. 11).  Wesselmann was coached for her failure to communicate effectively with regard to her email correspondence with Plaintiff. (Kelly Dep. 81:5-23).

On January 22, 2021 Plaintiff and Lee had a meeting where Lee told Plaintiff to give her a yes or no answer about whether she would prepare an IEP assessment.   (Ward Dep. I 77:7-22, 97:6-21, 104:25-105:4).   Plaintiff began recording the conversation half-way through because she felt that she was being asked to do something unethical as she is not trained in the IEP process and was worried about her license.  (Ward Dep. I 77:7-22, 97:6-21, 104:25-105:4).

On February 8, 2021, Plaintiff received an email from a teacher Barbara Saczalski with the subject "transition plans" and stating "I have three students who

we need to develop transition plans for.  Could you direct me as to what to do? I haven't done any for about 5 years and need some guidance." (Ward Dep. I 191:7-199:21, Ex. 37).  Plaintiff forwarded the email to Marsh and asked how she should respond to the email; Marsh told Plaintiff to tell the teacher that she had not been trained in that process and to provide them with the name of the Transition Resource Specialist for support.  (Marsh Dep. 65:10-68:12, Ex. 8-9).  Plaintiff responded in the manner that Marsh told her to, but Kelly did not feel that the response was professional.  (Marsh Dep. 68:4-12; Kelly Dep. 68:5-70:10, Ex. 8).

Plaintiff spoke to both Wesselmann and Saczalski regarding their emails, and both said they needed assistance with the transition plan; neither one said they meant to say "career assessment" instead of "transition plan." (Ward Dep. II, **Ex. B,** 417:22-420:2).  After Plaintiff received these two emails from the teachers regarding transition plans—something she was not trained to do—it was determined that the middle and high school teachers at H.A.V.E.N. needed additional training on writing transition plans and assessments, and a mandatory training was given on February 10, 2021. (Kelly Dep. 73:15-78:13, Exs. 9-10).

**<u>Plaintiff Receives a Letter of Direction and Is Told Her Contract is Being Put on Hold but That it Would Be Released in May "If All Goes Well"</u>**

On or about February 8, 2021, Lee issued Plaintiff a Letter of Direction alleging that she needed improvement in the areas of communication and building relationships with all stakeholders.  (Ward Dep. I 162:5-25, Ex. 33).  On February

9, 2021, Kelly and Lee had a meeting with Plaintiff in which they discussed the Letter of Direction and told Plaintiff that they could move forward with another Letter of Direction, suspension, or even termination; Kelly also told Plaintiff that they were going to hold her 2021/2022 contract but that they would "take the next few weeks and review things during these weekly meetings and – if all is well, then we'll advise the district to release your contract."   (Ward Dep. I 167:23-169:16; Transcript of February 9, 2021 Recording, **Ex. I,** 5:15-7:25, 21:19-25). When Plaintiff heard that her contract was being put on hold, she was distraught as her whole livelihood and her family depended on her contract; Plaintiff thought she might lose her husband because she would not have the money to pay for his cancer treatment and other medical needs.   (Ward Dep. I 169:17-170:18; Ward Dep. II 421:16-425:18).   Plaintiff expressed how she was shocked that her contract was being held over one email exchange she had with Wesselmann.   (Transcript of February 9, 2021 Recording, 22:7-8, 28:24-29:6).   Kelly told Plaintiff that he understood that his decision to hold her contact would cause some emotion to come out.  *Id.*

On February 26, 2021, during Plaintiff's second weekly meeting with Kelly and Lee, Kelly again told Plaintiff, "So one of the things that I say that we're going to take a look at is **over these next few weeks** as we talk about – excuse me – moving to 2021, '22 school year, before we release or I get in touch with HR to say

things have improved, let's go ahead and release DeRhonda Ward's contract for next school year" and again acknowledged that holding someone's contract would cause "a level of frustration with anyone." (Transcript of February 26, 2021 Recording, **Ex. J,** 5:2-5, 13:23-14:12). Kelly also told Plaintiff at the end of the February 26 meeting that for the next school year, he wanted her to start getting more involved in academics, including a new computer science course. (Transcript of February 26, 2021 Recording, 25:13-26:22; Ward Dep. II, 420:20-421:15).

On March 4, 2021, during Plaintiff's third weekly review meeting, Kelly told Plaintiff that he would make the decision whether or not to release her contract *in May 2021—once the district sent him an email asking whether he wanted to release her contract.* (Transcript of March 4, 2021 Recording, **Ex. K,** 10:3-23).

**Plaintiff Requests FMLA Leave to Care for Her Husband After His Surgery for Stage 4 Prostate Cancer**

Plaintiff's husband (who has since passed away) was dealing with two major health issues at once—stage 4 kidney disease and stage 4 prostate cancer—and in March 2021, Plaintiff got a call stating that if her husband did not address his prostate cancer, then he would not be able to get on the kidney transplant list. (Ward Dep. II 421:16-425:18). Plaintiff notified Kelly—while in tears—of her husband's condition. (Kelly Dep. 95:10-97:15). On or about March 3, 2021, Plaintiff called Stacy Sinclair, Benefits Representative, and told her that she needed to take FMLA leave. (Ward Dep. II 425:19-426:16). Sinclair told Plaintiff

that Kelly would need to sign the FMLA paperwork. *Id.* Kelly does not recall when he was first notified about Plaintiff's need to take FMLA leave, however, on March 9, 2021, he signed her FMLA paperwork approving her leave from March 26, 2021-May 7, 2021. (Kelly Dep. 91:18-94:4, Exs. 14-15).

**Once Kelly Is Made Aware of Plaintiff's Need for Leave, He Piles Work on Her Plate and Requires that She Complete it Prior to Her Leave Despite the Fact that She Expresses She is Extremely Overwhelmed**

On March 8, 2021—the day before Kelly signed Plaintiff's FMLA paperwork—he sent her an email asking if career assessments had been completed for all students. (Kelly Dep. 104:21-110:10, Ex. 19-20). Plaintiff responded explaining that not all students had completed a formal career assessment but that she had given several of them career videos and awareness classes and also sent Kelly the email she had received stating that the Georgia DOE exempted career assessments due to COVID. *Id.* On March 10, 2021—the day after Kelly signed Plaintiff's FMLA paperwork—during a weekly review meeting—Plaintiff told Kelly that she was extremely stressed and overwhelmed both in her personal and professional life stating that she was going through a "very, very, very tough" time and said she was human, and was asking him to please not pile any more work on her at this time since the state has suspended career assessments at this time and she had work for other administrators in the building that needed to get done before she went on leave. (Transcript of March 10, 2021 Recording, **Ex. L,** 19:12-

20:17). Kelly responded to Plaintiff stating that everyone was stressed and had job duties that needed to be completed, and that the reason they were talking about prioritizing assignments was because there were only two to three weeks before she went out on leave and certain things needed to be in place before she left. (Transcript of March 10, 2021 Recording, 20:18-22:22). On March 12, 2021, Plaintiff had another weekly review meeting with Lee and Kelly and Kelly told Plaintiff that he felt the meeting was cordial. (Kelly Dep. 133:7-135:17).

On Sunday, March 14, 2021—after Plaintiff had expressed how overwhelmed she was—Kelly, who had never sent Plaintiff an email on the weekend, sent Plaintiff an email with "High" importance "adding the 3 elementary career assessments/inventories to the priority list that should be completed before you start leave" despite the fact that: 1) career assessments for middle and high school had been waived for the fiscal year due to COVID; and 2) elementary school students do not have transition plans nor BRIDGE law requirements even in a normal year. (Ward Dep. II 404:7-406:13, 408:12-416:17, Ex. 48).

**Plaintiff's Complaint of FMLA Retaliation to Human Resources**

On March 16, 2021, Plaintiff submitted a claim for FMLA retaliation to LaTosha Hayes-Sperling, Investigations Manager, and detailed the inordinate amount of work that Kelly had put on her plate stating that it needed to be completed prior to leave. (Ward Dep. I 25:16-26:19; Dowd Dep., **Ex. E,** 45:17-

11

48:9, Ex. 6).  Kelly does not recall if he knew about her complaint of retaliation. (Kelly Dep. 184:3-185:17).

**Kelly's Decision Not to Renew Plaintiff's Contract**

Kelly claims he made the decision not to renew Plaintiff's contract after the March 18, 2021 weekly meeting—**nine days** after he signed Plaintiff's FMLA paperwork and a mere **two days** after she filed her complaint of FMLA retaliation. (Kelly Dep. 40:13-41:24, 134:7-135:5, 161:20-163:3).  Kelly never communicated to Plaintiff that she was not showing the required improvement needed to release her contract.  (Ward Dep. II 420:3-421:15; Kelly Dep. 159:23-160:14).   Plaintiff thought she was on track to get her contract released.  (Ward Dep. II 420:3-421:15).

**Plaintiff's Modified FMLA Leave**

On March 22, 2021, Plaintiff's FMLA leave was approved to start a day earlier than originally requested (i.e. to start on March 25, 2021 instead of March 26, 2021) and Kelly was notified of the change by Sinclair on two separate occasions—on March 22, 2021, the same day the change was approved, and again on March 25, 2021.  (Kelly Dep. 139:8-140:9, 146:4-21, Exs. 27, 30).  On March 25, 2021, Kelly sent Plaintiff an email stating that she did not communicate to him that her leave would start on March 25 as opposed to March 26.  (Kelly Dep. 146:22-149:3, Ex. 31).  Plaintiff responded stating that he was informed of the

change via email by Sinclair on both March 22 and also on March 25.  *Id.*  FMLA policy does not require employees to notify their leadership of the need for leave. (Kelly Dep. 150:5-151:20, Ex. 32).

That same day, on March 25, 2021—despite the fact that Kelly had allegedly already made the decision not to renew Plaintiff's contract—Kelly asked Sinclair to send him the communications she had with Plaintiff related to her FMLA leave. (Kelly Dep. 140:10-145:19, Exs. 28-29).   Sinclair responded that she could not provide the doctor's paperwork per his request of when Plaintiff's leave changed from March 26 to March 25 but that she attached the dialogue that was exchanged between her and Plaintiff regarding the change.  *Id.*  The email exchange between Plaintiff and Sinclair was sent to Hayes-Sperling, who was aware of Plaintiff's claim of FMLA retaliation, and also to Christopher Dowd, Executive Director of Employee Relations and Evaluations.  (Dowd Dep. 13:25-14:5, 50:2-52:6, Ex. 8). Dowd questioned why Kelly was concerned about the fact that Plaintiff was taking leave one day earlier than anticipated.  (Dowd Dep. 13:25-14:5, 50:2-52:6, Ex. 8)

**On April 22, 2021—While Plaintiff was on FMLA Leave—Kelly Communicates to Dowd His Decision Not to Renew Plaintiff's Contract**

On April 22, 2021, Dowd sent Kelly an email asking if he should release Plaintiff's contract and Kelly stated—for the first time in writing—that he recommend Plaintiff not receive a contract despite the fact that they did not implement a Professional Learning Plan ("PLP") which is a plan that they put

together for six to eight weeks for the employee to show consistent growth and improvement in designated areas. (Kelly Dep. 37:14-43:1, Ex. 3). Dowd does not recall if he was not aware that Plaintiff was on FMLA leave at the time he sent that email. (Dowd Dep. 56:16-19). Plaintiff learned that her contract was not being renewed on May 7, 2021, while on FMLA leave. (Dowd Dep. 62:4-63:6, Ex. 12)

**Plaintiff Returns from Leave and Is Subject to Further Hostility and Retaliation**

On May 18, 2021,[2] Plaintiff met with Lee and Kelly for another weekly review meeting during which Kelly continued to question Plaintiff about why she did not communicate that she needed her leave to start one day earlier than originally anticipated. (Transcript of May 18, 2021 Recording, **Ex. O,** 4:25-6:14). Plaintiff told Kelly that she could not communicate the need for leave with him until it was approved by the benefits department, and as soon as it was approved on March 22, he received notification of the change from Sinclair. (Transcript of May 18, 2021 Recording, 4:25-6:14). Plaintiff felt the meeting was retaliatory and further questioned why she was having the weekly review meeting given that her contract status had been determined and Kelly had previously told her that the purpose of the weekly review meetings was to determine whether he would advise

---

[2] The cover page of the Certified Transcript says "WEEKLY REVIEW March 25, 2021; however, that date is incorrect as Plaintiff had already started her FMLA leave on that date. The weekly review was on or about May 18, 2021.

the district to release her contract. (Transcript of May 18, 2021 Recording, 6:15-7:9, 11:7-15:9-13).

On May 19, 2021, Plaintiff had her summative review conference call with Lee and Kelly who informed her that for the rest of the school year, she was no longer allowed on campus in order to "minimize any disruptions on campus" (something he had never asked another employee to do), that she had to return her laptop which meant she could no longer complete any work, and that she would be paid for the time.  (Kelly Dep. 157:18:159:6, 165:13-176:10, 183:5-18, Exs. 34-36).  However, Plaintiff was not paid for any date after May 20, 2021 until over two years later, during discovery in this matter.  (Dowd Decl., **Ex. H**, ¶ 8). Plaintiff sent Kelly an email on May 24, 2021, stating that her official letter of non-renewal stated that her employment would end on May 28, 2021 if she did not resign by May 21, 2021—which she did not—and that it appeared he had adjusted those dates because she was now being forced to stop working before May 28. (Kelly Dep. 165:13-168:11, Ex. 35).

On May 27, 2021, Plaintiff filed another complaint of FMLA retaliation with Dowd.  (Dowd. Dep. 63:9-68:3, Exs. 13-14).  Despite Dowd telling her he would get back to her with the results of the investigation, he never did so.  *Id.*

**<u>Expert Reports</u>**

On June 12, 2023, Dr. Samuel M. Lundstrom, Defendant's expert witness, produced a report on the issue of Plaintiff's damages. (June 12 Lundstrom Report, **Ex. Q**). The report acknowledged that there were lost wage damages from the gap in Plaintiff's employment between the time she was terminated from CCSD and the time she began working at Atlanta Public Schools ("APS") but stated that on net, Plaintiff's total earnings through retirement age, would meet or exceed what they would have been at CCSD. *Id.*

On October 9, 2023—two days before Plaintiff's expert rebuttal report was due—Defendant produced a revised expert report updating his calculation of the lost wage damages from the gap in Plaintiff's employment between the time she was terminated from CCSD and the time she began working at APS, and updating his analysis to include new economic information made available. (October 9 Lundstrom Report, **Ex. R**).

On October 11, 2023, Plaintiff produced a rebuttal report (dated October 10, 2023) from Dr. Baris Yoruk. (October 10 Yoruk Report, **Ex. G**). That report detailed that Plaintiff faced—and will continue to face—significant damages as a result of her termination from CCSD as a result of lost wages, a lower daily rate at APS, increased commuting costs, and lost social security retirement benefits and Teacher Retirement System ("TRS") benefits. *Id.*

On November 29, 2023, Dr. Lundstrom produced a rebuttal report with alleged challenges to Dr. Yoruk's report. (November 29 Lundstrom Report, **Ex. S**).

**<u>Plaintiff's Damages</u>**

As detailed above, or about May 21, 2021 CCSD sent Plaintiff a notice of non-renewal letter, giving her the option to either resign in lieu of non-renewal by May 21, 2021 or to continue working at CCSD until her contract term expired on May 28, 2021.  (Dowd Decl., ¶ 8).  Despite Plaintiff choosing not to resign and to continue working until May 28, Plaintiff was not paid for the dates May 20-21 and 24-28, 2021 until the discovery in this lawsuit.  *Id. at* ¶ 10.  Kelly told Plaintiff not to work on those days but told her that she would receive salary payments for those days.  *Id.*  However, she did not receive payment for those dates until years later. *Id.*  Plaintiff is entitled to liquidated damages for those dates.

In addition, Plaintiff is entitled to the gap in pay between the time that she left CCSD and the time that she began her employment at APS.[3]  Originally, in his June 12, 2023 report, Defendant's expert, Dr. Lundstrom, calculated this amount to be $6,748.  However, in his October 9, 2023 report, he later changed his opinion and calculated that amount to be $3,096.50 despite the fact that there was no new

---

[3] Plaintiff began working as a School Counselor for APS in mid-August 2021, earning her first paycheck at the end of the month.  (October 10 Yoruk Report, pg. 45).

documentation provided to him on the issue between the time he made his June 12, 2023 report and his October 9, 2023 report.  (Lundstrom Dep., **Ex. F,** 11:24-16:4).

As part of her back pay damages, Plaintiff is also entitled to damages resulting from a lower daily rate at APS than she made at CCSD.[4]  The CCSD salary schedule shows the annual pay for each staff member as well as the daily rate based on ***188 working days per year***.  (October 10 Yoruk Report, pg. 53).  Similarly, the APS teacher salary schedule specifies that staff have ***"200 duty days."***  *Id.* at 62.  Additionally, Plaintiff's employment contract at both schools specified the number of days she was expected to work per school year—her contract at CCSD specified 188 days and her contract at APS specified 200 days.  *Id.* at 41-45.

Plaintiff is also entitled to lost compensation for the increased costs associated with her longer commute to APS, lost social security retirement benefits, and lost TRS benefits.  (October 10 Yoruk Report).  Dr. Yoruk estimates

---

[4] Although Plaintiff's annual yearly salary is currently higher at APS, her daily rate is lower as she is required to work 12 extra contract days at APS.  Additionally, it is important to note that the salary gap between APS and CCSD narrowed quite a bit in the 2023-2024 salary schedule (as compared to the 2022-2023 salary schedule).  (Lundstrom Dep. 17:16-25).  Moreover, as Defendant's expert, Dr. Samuel Lundstrom testified, in the past, there have been years in which APS had a ***lower salary*** than CCSD**.**  (Lundstrom Dep. 17:16-25).  Therefore, there is no guarantee that the annual salary at APS will remain higher than at CCSD.

that the present value of Plaintiff's damages, through retirement, total $200,015, not including attorneys' fees and costs.  (October 10 Yoruk Report, pg. 18).

## III.    ARGUMENT AND AUTHORITIES.

### A.    Summary Judgment Standard.

Summary judgment is only proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant must show that "everything in the record . . . demonstrates that no genuine issue of material fact exists."  *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986).  Genuine issues of material fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).  In deciding whether a genuine issue of material fact exists, the Court must accept the truth of Plaintiff's allegations and evidence and "must draw all reasonable inferences in Plaintiff's favor."  *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996).

### B.    Jury Questions Exist Regarding Plaintiff's FMLA Retaliation Claim.

The FMLA states, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the existence of or attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1).  This language creates a cause of action for retaliation, "in which an employee asserts that his employer discriminated

against him because he engaged in activity protected by the Act." *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006).

Absent direct evidence of retaliatory intent, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973) applies. *Brungart v. Bellsouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000). Under that approach, the employee claiming FMLA retaliation must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was casually related to the protected activity. *Id.*

Once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer "to articulate a legitimate reason for the adverse action." *Hurlbert v. Mary's Health Care Sys. Inc.,* 439 F.3d 1286, 1297 (11th Cir. 2006). If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse decision." *Id.* at 1298 (internal quotation marks omitted).

Here, Defendant concedes that Plaintiff can make a *prima facie* case under the *McDonnell Douglas* framework given the temporal proximity between her

protected activity and Kelly's non-renewal decision.[5]   [Dkt. 55-18, pg. 14]. Therefore, the only element Plaintiff has to establish is that CCSD's reasons given for not renewing her contract, were pretextual.

> ### i.   There is an Overwhelming Amount of Evidence that Proves CCSD's Reason for the Non-Renewal Decision is Pretextual; Summary Judgment is Not Appropriate.

Plaintiff may show pretext by "demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the employer's] proffered legitimate reasons" such that "a reasonable factfinder could question their credibility." *Gutter v. GuideOne Mut. Ins. Co.*, 17 F.Supp.3d 1261, 1273-74 (N.D. Ga. 2014) (quoting *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1252, 1265 (11th Cir. 2010)).

Defendant claims that Plaintiff cannot show pretext because temporal proximity alone is not enough to establish pretext and temporal proximity is the "only evidence Ward has." [Dkt. 55-18, pg. 17].  This is simply not true.  First, the

---

[5] "The Eleventh Circuit has established that the causal link element is to be construed broadly."  Eleventh Circuit case law has made it clear that close temporal proximity between the protected activity and the adverse action is enough to establish a causal connection.  *See Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir 2010) (noting that close temporal proximity between use of FMLA leave and termination is "more than sufficient" to establish a genuine issue of material fact on causation).  Here, there was a mere ***two days*** between when Plaintiff made a complaint of FMLA retaliation and when Kelly made the non-renewal decision and a mere ***nine days*** between when Kelly signed Plaintiff's FMLA paperwork and when he made the non-renewal decision.  (Ward Dep. I 25:16-26:19; Kelly Dep. 40:13-41:24, 91:18-94:4, 134:7-135:5, 161:20-163:3, 184:3-185:17, Exs. 14 and 15; Dowd Dep. 45:17-48:9, Ex. 6).

Courts in the Eleventh Circuit put a significant amount of weight on temporal proximity—in the pretext stage—where the temporal proximity is very close. *See Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1278 (11th Cir. 2020) (holding that where Plaintiff was fired only 37 days after disclosing her diagnosis and asking for leave was sufficient evidence of pretext). *See also Hurlbert*, 439 F.3d at 1298 (finding proximity of two weeks enough to support pretext); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1276 (11th Cir. 2017) (holding that a "one-month period" between returning from FMLA leave and termination supported pretext).  Here, there was a mere ***two days*** between when Plaintiff made a complaint of FMLA retaliation and when Kelly made the non-renewal decision and a mere ***nine days*** between when Kelly signed Plaintiff's FMLA paperwork and when he made the non-renewal decision.  (Ward Dep. I 25:16-26:19; Kelly Dep. 40:13-41:24, 91:18-94:4, 134:7-135:5, 161:20-163:3, 184:3-185:17, Exs. 14, 15; Dowd Dep. 45:17-48:9, Ex. 6).

Second, Plaintiff has a significant amount of evidence to prove pretext aside from mere temporal proximity.  Plaintiff has presented evidence that soon after Kelly became aware of Plaintiff's need for leave, he immediately began to pile a significant amount of work on her plate—work had been exempted both by the Georgia Department of Education and the counseling department—despite the fact that she pleaded with him not to pile on any more work given what she was going

through personally and professionally.   (Kelly Dep. 104:21-110:10, Ex. 19-20; Transcript of March 10, 2021 Recording, 19:12-22:22; Ward Dep. II 404:7-406:13, 408:12-416:17, Ex. 48).   *See Green v. Magellan Health, Inc*., No. 1:20-cv-5016-SCJ-LTW, 2022 WL 17908662, at *12 (N.D. Ga. Nov. 7, 2022) (denying summary judgment and holding that a reasonable factfinder could conclude that the decisionmakers at the Company gave Plaintiff additional work in retaliation for taking FMLA leave).

Additionally, Kelly made the decision not to renew her contract after the March 18, 2021 weekly review meeting—and without giving her the full benefit of all the weekly meetings—knowing that she was going on FMLA leave.  In fact, the evidence shows the following:

- On February 9, 2021, Kelly and Lee had a meeting with Plaintiff in which they discussed the Letter of Direction and told Plaintiff that they could move forward with another Letter of Direction, suspension, or even termination.  (Transcript of February 9, 2021 Recording, 5:15-7:25).  In other words, there were lots of available options prior to termination—none of which happened.

- Kelly also told Plaintiff at the very end of the February 26 weekly meeting that for the 2022/2023 school year, he wanted her to start getting more involved in academics, including a new computer science course. (Transcript of February 26, 2021 Recording, 25:13-26:22; Ward Dep. II, 420:20-421:15).

- On March 4, 2021, during Plaintiff's third weekly review meeting, Kelly told Plaintiff that he would make the decision whether or not to release her contract in May 2021—once the district sent him an email asking whether he wanted to release her contract.  (Transcript of March 4, 2021 Recording, 10:3-23).

- On April 22, 2021, Dowd sent Kelly the email asking if he should release Plaintiff's contract and Kelly stated—for the first time in writing—that he recommend Plaintiff not receive a contract despite the fact that they did not implement a Professional Learning Plan ("PLP") which is a plan that they put together for six to eight weeks for the employee to show consistent grown and improvement in designated areas.  (Kelly Dep. 37:14-43:1, Ex. 3).  Dowd does not recall if he was aware that Plaintiff was on FMLA leave at the time he sent that email.  (Dowd Dep. 56:16-19).

Given the above, a reasonable jury could conclude that had Plaintiff not taken FMLA leave, she would have been given the benefit of all the weekly meetings to improve her performance.  In fact, **Kelly told Plaintiff** on March 4, 2021, that he would give her until May—when the district reached out to him—to evaluate her performance.  (Transcript of March 4, 2021 Recording, 10:3-23).

In cases such as this one, the Courts in this Circuit deny summary judgment where the employer cannot establish beyond dispute that they would have terminated the Plaintiff had she not taken FMLA leave.  For example, in *Martin v. Brevard Cnty. Public Schools,* the Plaintiff was a Payroll Supervisor and was a performance improvement plan which afforded him until June 1, 2004 to demonstrate progress in the improvement plan.  *Martin*, 543 F.3d 1261, 1263-64 (11th Cir. 2008).  Plaintiff then took leave beginning on May 7, 2004; while he was on leave, his leadership recommended to Human Resources that he not receive a contract based on his failure to improve his performance.  *Id.* at 1264-65.  The School District moved for summary judgment on Plaintiff's FMLA claims, which

the district court granted. *Id.* at 1265. However, the Eleventh Circuit overturned the decision and held that summary judgment was not appropriate where the record was not clear as to whether Plaintiff's contract would have been renewed if he had been able to complete the final three weeks and where there was such a close temporal proximity between his FMLA leave and termination. *Id.* at 1267-68.

In another factually similar case, the Eleventh Circuit again reversed the district court's grant of summary judgment where the employer cut short the time Plaintiff had to improve her performance upon learning that she had invoked her right to FMLA leave even where there was a progress report demonstrating that the decision maker was displeased with Plaintiff's progress. *Turner v. Florida Prepaid College Board*, 522 Fed. App'x 829, 835-836 (11th Cir. 2013).

Defendant argues that because Kelly stated on February 9, 2021, during the first weekly review meeting, that they would "take the next few weeks and review things during these weekly meetings and – if all is well, then we'll advise the district to release your contract"—Plaintiff was not entitled to any more time to improve her alleged performance deficiencies. However, there is a clear dispute on this issue. First, the term "the next few weeks" is vague and does not provide any clear guidance on when exactly he would make the decision. Second, Kelly said this same thing again at the February 26, 2021 weekly review meeting two weeks later—further obscuring when he planned to make the decision. Lastly,

Kelly clearly told Plaintiff that he would not make the decision until the district reached out to him in May 2021. Given that the term "the next few weeks" is vague but Kelly clearly told Plaintiff that he would not be making the decision until the district reached out to him, a reasonable jury could—and most likely would—conclude that he did not plan to make the decision until the district reached out to him (which turned out to be on April 22, 2021).

As further evidence of pretext, there is substantial evidence from which a jury could conclude that Kelly took an unusual amount of interest in finding out more information about Plaintiff's FMLA leave. (Kelly Dep. 140:10-145:19, Exs. 28-29). Although Defendant argues that the reason he took such an interest is because Plaintiff failed to communicate to him that she would need to go on leave a day earlier than anticipated—even though she knew that he had been copied on emails from the benefits department informing him of the change—the explanation makes no sense because Plaintiff's contract status had already been determined. In a similar vein, despite Plaintiff being told that the reason for the weekly meetings was to determine her contract status, Kelly required Plaintiff to attend a final weekly meeting after her leave, and after her contract status had been determined, in which he again harped on the fact that she never communicated that her leave would start a day earlier. (Transcript of March 4, 2021 Recording, 10:12-23; Transcript of May 18, 2021 Recording, 6:15-7:9, 11:7-15:9-13). This is clearly

evidence of pretext. *See Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1278 (11th Cir. 2020) (reversing grant of summary judgment on FMLA retaliation claim where—in a performance meeting—supervisor appeared more concerned with Plaintiff's absences than her performance).

Finally, the manner in which Plaintiff was treated following her leave is further evidence of pretext. Not only was Plaintiff forced to attend both her weekly meeting and her summative review conference—despite her contract status having already been determined—she was told that she was no longer allowed on the property (something Kelly had never asked of another employee), was told she could no longer perform any work for CCSD, and was not paid for any day past May 20, 2021 (until over two years later) despite her official letter of non-renewal stating that her employment would end on May 28, 2021. (Kelly Dep. 157:18:159:6, 165:13-176:10, 183:5-18, Exs. 34-36; Dowd Decl., Dkt. 55-6, ¶ 8).

Given the *extremely* close temporal proximity between Kelly's decision not to renew Plaintiff's contact and both her requesting of FMLA and her complaint of FMLA retaliation, and the significant amount of evidence from which a jury could find demonstrates pretext—summary judgment is due to be denied.

### C. Defendant's Argument That Plaintiff Has No Viable FMLA Remedy is Frivolous.

Defendant's argument that "even if Ward could show retaliatory causation, her FMLA claim still fails because she cannot prove actual damages" is frivolous

and quite bold given that: 1) even Defendant's expert acknowledges that there are damages—specifically a gap in her employment between APS and CCSD; and 2) Defendant cannot dispute that Plaintiff is seeking the equitable relief of front pay [Complaint, Dkt. 1, pg. 13] (requesting "that front pay be awarded as the employment relationship has been so severely damaged that the relationship is unsalvageable"). Although Plaintiff and Defendant have a different valuation of the back and front pay damages—because Defendant acknowledges that there are damages—those arguments are not appropriate at this stage. They are for a jury.

Defendant attempts to cite two cases in support of its claim that Plaintiff has failed to create a jury question on the issue of damages. These cases involve starkly different facts than the facts present here. First, the case of *Wai v. Fed. Exp. Corp.,* 461 F. App'x 876, 886 (11th Cir. 2012)—in which Defendant states that the Court vacated "nearly 80% of damages award because jury lacked evidentiary basis for awarding back pay, health insurance, and 401(K) benefits"— was not a summary judgment case. In that case, the Court vacated the award— after a jury trial—because the jury awarded front pay even though the jury instructions explicitly limited the jury's authority to assessment of damages in the past (to the date of the verdict). *Id.* at 855. In addition, the Court held that the jury's award for Plaintiff's retirement or 401(k) benefits were pure speculation because Plaintiff "did not provide any testimony relating to the value of her

retirement or 401(k) plans" rather "she only testified that, when she withdrew funds from her 401(k) plan, $5,000 to $6,000 remained." *Id.* at 886. The facts here could not be more different. This is a summary judgment motion, there has been no trial testimony.

In a similar vein, the case of *Aponte v. Brown of Fla., Inc.*, 806 F. App'x 824, 828 (11th Cir. 2020) is unavailing. In that case, the Eleventh Circuit affirmed the district court's granting of summary judgment on certain portions of Plaintiff's **FMLA interference claim** based on the fact that they were technical damages and Plaintiff had not demonstrated any monetary damages. *Id.* However, a review of the Middle District of Florida's opinion demonstrates that the interference claims for which Plaintiff could not prove any damages stem from: the employer (1) failing to provide him notice of his FMLA rights; (2) failing to designate his week-long hospitalization and subsequent convalescence as an FMLA-qualifying absence; and (3) refusing to answer his email questions about his FMLA rights. *Aponte v. Brown of Fla., Inc.*, No. 6:18-cv-161-Orl-22GJK, 2019 WL 12536011, at *12-13 (M.D. Fla. March 1, 2019). Here, we are dealing with an FMLA retaliation claim in which Plaintiff was not paid for the dates May 20-21 and 24-28, 2021 until the discovery in this lawsuit (despite still being an employee of CCSD), was terminated from her position, was out of work for a period of time, works for an

employer that has a lower daily rate, has a further commute, and no longer works for a school that is a social security covered employer.

### i. Plaintiff is only seeking damages for wages, salary, employment benefits, or other compensation denied.

The FMLA allows for damages equal to "the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation.  29 U.S.C. § 2617(a)(1)(A)(i)(I) ("Subsection I").  In a case in which the damages available under Subsection I have not been denied, the employee is entitled to "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee."  29 U.S.C. § 2617(a)(1)(A)(i)(II) ("Subsection II").  Defendant argues that Plaintiff cannot claim damages under both subsections.   However, Plaintiff is not claiming damages under both subsections.  As explained in more detail below, all damages in Dr. Yoruk's report fall under Subsection I.

In addition to damages, under 29 U.S.C. § 2617(a)(1)(B), the FMLA specifically provides for "such equitable relief as may be appropriate, including employment, reinstatement, and promotion.  "While the appropriateness of a particular equitable remedy is left to the trial court's discretion, the court must consider the individual facts and circumstances of a plaintiff's case and must not

refuse even to consider equitable relief." *Evans v. Books-A-Million*, 762 F.3d 1288, 1296 (11th Cir. 2014) (holding that the district court's adoption of the magistrate judge's conclusion that "[b]ecause the plaintiff cannot establish that she suffered any loss of income . . . she cannot state an FMLA claim" was error). Under the FMLA, "a court may award front pay as a form of equitable relief where reinstatement is not feasible," and such an award "is derived solely from the statutory provision permitting the court to award 'such equitable relief as may be appropriate.'" *Wai v. Fed. Exp. Corp.*, 461 F. App'x 876, 884 (11th Cir. 2012).

> ii.    **Contrary to Defendant's assertion, the FMLA does allow damages for lost leisure time, increased commuting costs, and lost social security retirement benefits.**

The FMLA—like other federal employment statues—allows for lost leisure time, increased travel expense, and lost social security retirement benefits.

> a.    *Lost leisure time.*

Defendant contends—based on its unsupported assertions without any legal basis—that the FMLA does not permit recovery about the value of Plaintiff's lost opportunity cost or lost leisure time.  As an initial matter, Defendant does not cite a single case for this proposition.  Moreover, as the Courts have held, lost leisure time/vacation time should be considered in the calculation of back pay/front pay. *See Scott v. Univ. of Mississippi*, No. 194CV241JAD, 1996 WL 33370646, at *1 (N.D. Miss. Mar. 8, 1996) (allowing damages for lost leisure time and holding that

"the extra leisure time is not without value"); *Buckley v. Reynolds Metals Co.*, 690 F. Supp. 211, 220 (S.D.N.Y. 1988) (holding that Plaintiff was entitled to compensation for lost vacation time as part of his front pay award where Plaintiff was entitled to five weeks each year of vacation at his former job and only two weeks per year at his current job); *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 876 (S.D.N.Y. 1999) (holding that lost sick and vacation days constitute benefits that should be included in a damages calculation).

In fact, in further support of Plaintiff's argument that the number of school days should be considered in damages, both the APS and the CCSD salary schedules detail the number of days each staff member will be working per school year. For example, the CCSD salary schedule shows the annual pay for each staff member as well as the daily rate[6] based on ***187 working days per year***. (October 10 Yoruk Report, pg. 53). Similarly, the APS teacher salary schedule specifies that staff have ***"200 duty days."*** *Id*. at 62. Additionally, Ms. Ward's employment contract at both schools specified the number of days she was expected to work per school year—her contract at CCSD specified 188 days and her contract at APS specified 200 days. *Id*. at 41-45. Clearly, given the nature of employment when

---

[6] Notably, as laid out in Dr. Yoruk's report, Ms. Ward's daily rate at APS is less than it was at CCSD. This is clearly something that should be considered by a jury.

working as a staff member at a school with very specific breaks including a long summer break, the number of school days is strongly considered and relevant.

### b.    *Increased travel expenses.*

Similarly, without any case law in support of its position, Defendant argues that increased commuting costs are too indirect to be recoverable under the FMLA. Defendant also argues that even if such costs were recoverable, they would be part of 29 U.S.C. § 2617(a)(1)(A)(i)(II) ("Subsection II")—both arguments are simply not true.  Not only are such damages recoverable, but they are damages that would be factored into both front pay and back pay—damages under 29 U.S.C. § 2617(a)(1)(A)(i)(I) ("Subsection I").

For example, in *Gaskins v. Vencor, Inc.*, No. IP 99-122-C-T/G, 2001 WL 1385890, at * 7 (S.D. Ind. September 12, 2001), the Court held that Plaintiff was entitled to commuting expenses as part of back pay and front pay.  Similarly, in *Van Horn v. Specialized Services, Inc.*, 241 F.Supp.2d 994, 1014 (S. D. Iowa 2003), the Court held that the Plaintiff was entitled to compensation as part of her front pay and back pay for both additional mileage as a result of having a longer commute at her new employer as well as commuting time costs at her hourly rate. *See also Smtih v. Voorhees College*, No. 5:05-19110RBH, 2008 WL 2627471, * 2 (D. S.C. June 27, 2008) (holding that Plaintiff was entitled to costs of commuting as part of back pay award as Defendant "benefitted by her being able to earn

similar income" because "had she not done so, defendant could be faced with a significantly larger back pay award"); *Thomas v. Cooper Industries, Inc.*, 627 F.Supp. 655, 668 (W. D. N.C. 1986) (holding that Plaintiff was entitled to commuting expenses are part of her back pay award); *Donlin v. Philips Lighting North America Corp.*, 581 F.3d 73, 89 (3rd Cir. 2009) (holding that Plaintiff did not fail to mitigate her damages even though she accepted a lower paying job where higher paying job was further away; "when factoring the increased cost of [Plaintiff's] commute to Romark into her overall compensation, we find that the positions were substantially equivalent and, therefore, [Plaintiff's] decision to take a lower-wage job at Mission was reasonable.")

### c.   *Lost social security retirement benefits.*

Defendant argues that the Court should exclude Dr. Yoruk's valuation of Plaintiff's future social security earnings because it is not a valid measure of damages.  In making such an argument, Defendant relies solely on the fact that social security benefits are an unlisted term in the statute.[7]   The problem with

---

[7] Defendant argues that the FMLA, 29 U.S.C. § 2611(5), defines "employment benefits" as "all benefits provided or made available to employees ***by an employer . . .***" and because social security benefits are provided by the Social Security Administration and not "by an employer," they do not meet that statutory definition.  This argument is weak.  When an employer is a social security covered employer, the employer is required to pay into the social security system in order to provide this benefit to its employees.  Therefore, social security retirement benefits are benefits made available by an employer, despite the fact that such benefits are administered by a third-party (as are other employment benefits).

Defendant's argument is that the case law holds otherwise. For example, in *Wallner v. Hillard*, No. 3:11-CV-359-CRS, 2015 WL 1979704, at * 6-8 (W.D. KY. April 30, 2015), the Court held—in an FMLA case—that lost social security retirement benefits were an element of Plaintiff's front pay damages. Specifically, the Court held that where the parties did not dispute that her future social security benefits would be diminished, the Court would allow the jury to calculate the front pay award, including her lost social security benefits. The Court stated as follows:

> Having considered the parties' arguments at great length, we will allow [Plaintiff] to move forth on her front-pay allegations. Uncertainty and speculation are an inherent part of front pay damages and will always be present to some degree [citations omitted]. Yet, what is nearly certain is that [Plaintiff] will continue to suffer losses on her Social Security benefits—it is really just a matter of how long. [Plaintiff] has put forth evidence that a jury can use to approximate how long, and [Defendant] is welcome to rebut it as it sees fit. We believe that an award of front pay would be appropriate in this case to "supplement back pay for the continuing future effects of [retaliation and] to make the victim whole." [citations omitted].

*Id.* at *7. Here, the parties similarly do not dispute that Plaintiff's social security retirement benefits would be diminished—therefore they should be considered as a part of both back pay and front pay.

## IV.   CONCLUSION.

For the foregoing reasons, Plaintiff has demonstrated the presence of material issues of fact that must be decided by a jury. Therefore, Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted this 11th day of March, 2024.

*s/ Jackie R. Lee*

Jackie R. Lee

Georgia Bar No. 419196

jackie@leelawga.com

LEE LAW FIRM, LLC

695 Pylant St. NE

Suite 105

Atlanta, GA 30306

Phone: (404) 301-8973

Attorney for Plaintiff

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DERHONDA WARD,

     Plaintiff,

v.

COBB COUNTY SCHOOL
DISTRICT,

     Defendant.

CIVIL ACTION NO.
1:22-cv-04453-SDG-RDC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2024 **Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment** was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send notification of such filing to the following attorneys of record:

Jeffery R. Daniel
jeffdaniel@parkerpoe.com

Nana Asante-Smith
nanaasantesmith@parkerpoe.com

*s/ Jackie Lee*
Jackie Lee
Georgia Bar No. 419196