# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DERHONDA WARD,

     Plaintiff,

v.

COBB COUNTY SCHOOL
DISTRICT,

     Defendant.

Civil Action No. 1:22-cv-04453-SDG-RDC

## DEFENDANT'S REPLY IN SUPPORT OF
## ITS SUMMARY JUDGMENT MOTION

The parties agree that, in effect, HAVEN Principal Isaac Kelly was the sole decisionmaker in the non-renewal of Ward's contract.[1] And under the *McDonnell Douglas* framework, there is no question that CCSD has met its intermediate burden of proffering legitimate, non-retaliatory reasons for Kelly's decision not to recommend renewal of Ward's contract. *See Meeks v. Computer Assocs. Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994). Thus, to withstand summary judgment, Ward must show that those reasons were pretext for unlawful retaliation. *See Chapman v. Al Transp.*, 229 F.3d 1012, 1024-1025 (11th Cir. 2000).

---

[1] Ultimately, both Ragsdale and Dowd both deferred to Kelly's business judgment in recommending non-renewal. [Doc. 55-1 ¶¶ 38-40.] Ward's response appears to concede these facts. [Doc. 65 ¶¶ 38-40; *see generally* Doc. 63.]

Though Ward's response brief promised an "incredible amount" of "overwhelming" pretext evidence [Doc. 63 at 1, 12], she has not delivered. The record abounds with evidence of Ward's deficits in communication and professionalism. That Kelly ultimately decided to non-renew her contract near the time of her FMLA activity does not suggest his proffered reasons were pretextual.

Beyond being unable to prove liability under the FMLA, Ward also cannot show she has sustained recoverable damages under the FMLA. With no viable remedy, she cannot proceed to trial, and summary judgment is proper.

## A. Ward has not shown that Kelly's proffered reasons for the non-renewal decision on March 18 were pretext for FMLA retaliation.

To establish pretext, Ward must show two things: (i) CCSD's proffered reasons were false; and (ii) FMLA retaliation was the real reason. *See Springer v. Convergys Customer Mmgt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007). To do so, she must prove that each proffered reason is so weak, implausible, inconsistent, incoherent, or contradictory that a reasonable juror could find it "unworthy of credence." *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010). Though temporal proximity between an employee's FMLA activity and an adverse employment action might be enough to establish prima facie causation, it is insufficient, by itself, to show pretext. *Howard v. M.A.R.T.A.*, No. 1:14-CV-03667-LMM-AJZB, 2016 WL 10998309, at *6 (N.D. Ga. Sept. 30, 2016). Thus, the fact

PPAB 10549686v3

that Kelly made his non-renewal decision near the time of Ward's FMLA leave is not enough to show pretext. *See id.*

Ward loses because her entire case depends on temporal proximity between her FMLA activity and Kelly's non-renewal decision. [*See* Doc. 63 at 21-22 (emphasizing that Kelly made the non-renewal decision two days after her complaint of FMLA retaliation and nine days after signing Ward's FMLA paperwork).] To begin, Ward cannot prove the complaint motivated Kelly's decision, because she cannot even show that Kelly knew of it. [Def's Resp. to Pl's Stmt. of Add'l Facts ¶¶ 35-36.] *See Kidd v. Mondo Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013). Even if Ward could show decisionmaker knowledge, the temporal connections are not enough to withstand summary judgment at the pretext stage. *See Tolar v. Bradley Arant Boult Commings, LLP*, 997 F.3d 1280, 1299 and n.6 (11th Cir. 2021).

Kelly decided to recommend non-renewal because of Ward's well-documented deficits in professionalism and communication. [Doc. 55-2 ¶¶ 18-20, 22-26.] Ward might disagree with Kelly's professional judgment, but she points to no evidence suggesting Kelly's reasons were wrong. [*Compare* Doc. 55-1 ¶¶ 32-35 *with* Doc. 65 ¶¶ 32-35.] Other than half-heartedly saying she thought she was making adequate progress, her brief is largely silent on that point. [*See generally* Doc. 63.] Given how poorly she conducted herself during the weekly review meetings, she could not hope to show she made any progress — much less adequate progress in

Kelly's eyes — on her underlying deficits in communication and professionalism. [*See* Doc. 55-2 ¶¶ 18-20, 22-26.] Because Ward cannot establish pretext without showing that Kelly's reasons were false, she loses summary judgment on that basis alone. *See Springer*, 509 F.3d at 1349.

But that is not all. Ward's pretext argument also fails because she cannot show that her FMLA activity was the real reason for Kelly's non-renewal decision. *See Springer*, 509 F.3d at 1349. Contrary to Ward's argument [Doc. 63 at 24-25], the mere fact that she was on a performance improvement plan shortly before her FMLA leave does not suggest retaliatory motive. As this Court has recognized, the existence of a performance improvement does not suggest pretext if the FMLA leave period began after the plan was completed. *See Howard*, 2016 WL 10998309, at *7.

For that reason, Ward's reliance on *Martin v. Brevard County Public Schools* and *Turner v. Florida Prepaid College Board* [Doc. 63 at 24-25] is misplaced. As this Court has recognized, "unlike our Plaintiff," the *Martin* and *Turner* "plaintiffs were terminated *before* they were able to complete their performance improvement plans." *Howard*, 2016 WL 10998309, at *7. Here, the undisputed facts show that: (i) Ward completed her improvement plan over the course of a "few weeks," before her FMLA leave period began; (ii) Kelly thought she had shown no progress and, if anything, had regressed; and (iii) Kelly made his non-renewal decision a week before her FMLA leave began. [Doc. 55-2 ¶¶ 12-14, 16-20, 22-26.]

-4-

In *Martin*, the summary judgment record was even more distinguishable from Ward's case. There, the school district-employer told the plaintiff his contract would not be renewed if his FMLA leave prevented him from fulfilling his plan. 543 F.3d 1261, 1264 (11th Cir. 2008). So by firing the plaintiff without giving him a chance to complete the plan, the school district was effectively holding the plaintiff's FMLA leave against him. *Id.* On those facts, the Eleventh Circuit held it was "a matter of speculation" whether the district would have still non-renewed the plaintiff's contract even if he had been able to complete the plan. *Id.* at 1267-68.

No such speculation is present here. Unlike the *Martin* plaintiff, Ward was not on a formal improvement plan that gave her a firm deadline for improvement. [Doc. 55-2 ¶ 16.] Kelly only gave her "the next few weeks" to show improvement — four to six weeks, at most. [*Id.* ¶¶ 12, 16.] After six meetings, Kelly thought Ward had not shown improvement in her glaring deficit areas, and was needlessly hostile and antagonistic during most of the meetings. [*Id.* ¶¶ 17-20, 22-26.] So, on March 18 —before Ward took her FMLA leave — Kelly decided he had seen enough and could not recommend renewal of Ward's contract. [*Id.* ¶ 26.]

In other words, there was no overlap between Ward's improvement plan period and her FMLA period. Unlike the *Martin* and *Turner* plaintiffs, Ward's FMLA leave did not deprive her of an opportunity to save her job. That is because,

-5-

unlike the employers in those cases, Kelly had already decided Ward's contract status before she took FMLA leave. Her fate was already sealed.

As detailed below, Ward has pointed to no record evidence creating a genuine dispute on this point. First, contrary to Ward's mischaracterization of the record, Kelly did not tell Ward he would wait until May to make a decision. Second, the confusion about Ward's amended FMLA start date does not suggest retaliatory motive. Third, the events after Ward's return from FMLA do not suggest that the long-prior non-renewal decision was retaliatory.

i.    **Kelly's statements at the March 4 meeting do not create a jury question about whether Ward had until May to save her job.**

No reasonable juror could find that Kelly intended to give Ward more than four-to-six weeks to save her job. On the contrary, Kelly said they would "take the next few weeks and review things during these weekly meetings and . . . if all is well, then we'll advise the district to release your contract. . . ." [Doc. 55-3 at 299 (21:21-25).] As Ward acknowledges, Kelly did "not provide any clear guidance on when exactly he would make the decision." [Doc. 63 at 25.]

That is because Ward was not on a formal, professional improvement plan with an explicitly defined plan period. [Doc. 55-2 ¶ 16.] As a non-tenured employee, she was not entitled to such protections before contract non-renewal. [*Id.*] Kelly has testified that, when he told Ward she had a "few weeks," he meant four to six weeks,

at most. [*Id.*] And in waiting until March 18 to make his decision, Kelly gave Ward exactly what he promised: a "few weeks" to save her job. [*Id.* ¶ 26.]

Ward cannot manufacturer a jury question by feigning ignorance about what a "few weeks" meant. By any commonly accepted definition, "few" means only a "small number."[2] It would not make sense for Kelly to tell Ward she had only a "few" weeks if he intended to give her the rest of the semester. Kelly's actions (giving Ward until March 18) align with what he said he would do.

Ward points to no record evidence suggesting Kelly considered a "few weeks" to mean more than four to six weeks. At most, she claims Kelly told her at the March 4 meeting that he would wait until May to make his decision. [*See* Doc. 63 at 2, 26-27.] But a review of the meeting transcript confirms Kelly said no such thing:

> And you know, if I didn't do a good job of answering your question, you know, I apologize. I know this is probably our fourth crack at trying to get it done. I know we tried -- one time I think when we first did the letter of direction, I know that we tried one time last week. And then I know that I just attempted to do it again. So if I didn't answer your question, you know, I do apologize. But I'm just letting you know these are the types of things that as we come along and we get to May and the district R send us an email to say hey, tell me about, you know, such and such and the areas that you have for improvement. Do we need to release a contract to this person? Then I'm going to come back and just review some of the meetings that we had. I'm going to come back and review what's been done. I'm going to come back and take into account

---

[2]    *See, e.g.*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/few (last visited April 5, 2024); DICTIONARY.COM, https://www.dictionary.com/browse/few (last visited April 5, 2024); CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/few (last visited April 5, 2024).

what did DeRhonda state in those meetings. How did she say her last
week went. How did she say that she improved.

[Doc. 66-11 at 10:3-23.]

At most, Kelly said he usually received an email from the district in May,
asking whether to release a contract that had been placed on hold, and he explained
the types of things he would consider when making that decision. [*Id.* at 10:12-23.]
Though Kelly discussed his deadline to communicate his nonrenewal
recommendation to CCSD, he never said that he intended to wait until May before
making a decision about Ward's contract status. [*See generally id.*]

After all, that would not make sense because, by any reasonably objective
standard, giving Ward until May (nearly the end of the school year) would be well
beyond a "few weeks." Furthermore, Kelly has separately explained that non-
renewal decisions had to be made by April, which is when he told Dowd about his
decision. [Doc. 55-2 ¶¶ 16, 33.] That April deadline does not change the fact that he
made the decision months prior — after giving Ward a "few weeks" to show
dramatic improvement. [*Id.* ¶ 26.]

**ii.    Kelly's confusion about the FMLA start date does not suggest
         retaliatory motive.**

Ward has pointed to no evidence suggesting that Kelly "took an unusual
amount of interest" in Ward's FMLA-related absence on March 25. [Doc. 63 at 26.]
As Kelly explained, he had no problem with Ward changing her leave start date.

-8-

[Doc. 55-2 ¶ 31.] But he did have a problem with her not proactively telling him she had done so. [*Id.*] CCSD's FMLA policy may not have required Ward to tell Kelly about the change, but the more general "Leaves and Absences" policy did. [*Id.* ¶ 31, Ex. D.] Had she done so, there would have been no confusion about when her leave period began, and Kelly would have rescheduled the meeting previously scheduled for March 25. [*Id.* ¶¶ 28-31.]

In other words, Ward's failure to give her boss that basic courtesy was yet another example of her deficits in communication and professionalism. [*Id.*] There is nothing suspicious about Kelly emailing with CCSD's benefits coordinator to get the details about her leave period, including any communications she had about the change in leave start date. Nor was there anything improper about Kelly emailing Ward later that day to make sure she knew the previously scheduled meeting would be postponed until she returned from leave. [*Id.* ¶ 32, Ex. C.]

Ward cannot prevail by relying on *Munoz v. Selig Enterprises, Inc.* [Doc. 63 at 26-27]. There, the summary judgment record had extensive evidence that the plaintiff's supervisor was far more concerned about her absences and tardiness than the job performance issues that ostensibly were the reason for her termination. 981 F.3d 1265, 1278 (11th Cir. 2020). Not so here. The overall record shows that Kelly was far more concerned about Ward's persistent, glaring deficits in communication and professionalism (a letter of direction and hours of review

-9-

meetings) than her absence on March 25 (a couple of emails). Unlike the supervisor in *Munoz*, Kelly was preoccupied only with trying to fix the job performance issues that had landed Ward on thin ice.

### iii.   The post-FMLA events do not suggest retaliatory motive.

On the pretext issue, Ward cannot create a jury question by pointing to events following her return to work, including her meetings with Kelly, Kelly's directive to stay home after May 19, and the clerical error regarding her payment on those days.

### a.   Kelly had legitimate, non-retaliatory reasons for telling Ward to stay home rather than coming in to work.

Contrary to Ward's argument [Doc. 63 at 3, 14-15, 27], there was nothing suspicious about Kelly's decision to hold meetings with Ward after her return to work or to have her stay home after May 19. Kelly has testified that Ward's FMLA leave played no role in those decisions. [Doc. 55-2 ¶ 40.] After Ward returned to school, Kelly wanted to meet with Ward for two reasons: (1) to hold the weekly review meeting relating to the March 19-25 period; and (2) to hold her summative conference. [*Id.* ¶¶ 35.] Kelly wanted to hold the weekly review meeting because Ward was still a HAVEN employee, and he expected her to continue working on her deficit areas while she worked there, even though her contract was not renewed for the upcoming school year. [*Id.* ¶¶ 14-15, 27, 34-35.] And the summative conference was required by law. [*Id.* ¶ 35.]

Ward cannot challenge Kelly's motives by complaining that she thought the meeting was retaliatory or unnecessary. [*See* Doc. 63 at 27.] She had not resigned, and she still had a job to do, which included meeting with her principal when he told her to do so. [Docs. 55-2 ¶ 34; 66-1 at 38:5-19, 39:23-40:2, Ex. 14.]

Yet, on May 18, Ward refused to participate in the weekly review portion, abruptly terminating the Teams conference while Kelly was mid-sentence. [Doc. 55-2 ¶ 36.] And she was openly aggressive and hostile during the summative conference on May 19. [*Id.* ¶ 37.] Based on how Ward conducted herself in those two meetings, Kelly was concerned that, during the remaining ten days of school, she would be a disruption and not conduct her job duties in good faith. [*Id.* ¶ 38.] So Kelly thought she was not worth the headache and told her to stay home. [*Id.* ¶ 39.]

Ward cannot manufacture a jury question by trying to "recast" Kelly's motives or second-guessing the wisdom of his business judgment. See *Alvarez*, 610 F.3d at 1265. Nor can she by arguing that Kelly had never asked another employee to stay home rather than coming in to work. [Doc. 63 at 27.] As the audio recordings of the meetings confirm, Ward was uniquely out-of-line in her interactions with Kelly, so it makes sense that Kelly never had to give that directive to other employees. In short, "the manner in which Plaintiff was treated following her leave" is not evidence of pretext [Doc. 63 at 27], but it is further evidence that Kelly made the right decision in non-renewing her contract.

-11-

### b. The clerical error about Ward's nonpayment on May 20-21 and 24-28 do not suggest retaliatory motive.

To prove FMLA retaliation, Ward must show that a pertinent decisionmaker had retaliatory intent — *i.e.*, that the decisionmaker *intentionally* took an adverse action against her because of her statutorily protected activity. *See Martin*, 543 F.3d at 1267. Though nonpayment or delayed payment might be in some cases actionable, it does not suggest retaliatory intent when, as here, it results from a clerical error. *See Parker v. Chilton Cnty. Bd. of Educ.*, No. 2:12-cv-0650-MEF, 2014 WL 116341, at *10 (M.D. Ala. Jan. 13, 2014); *Kelly v. Dun & Bradstreet, Inc.*, No. 1:09-CV-1498-CAP-WEJ, 2012 WL 12950959, at *34 (N.D. Ga. July 24, 2012), *report and recommendation adopted sub nom. Kelly v. Dun & Bradstreet*, No. 1:09-CV-1498-CAP, 2013 WL 12219180 (N.D. Ga. Mar. 6, 2013), *aff'd in part, vacated in part sub nom. Kelly v. Dun & Bradstreet, Inc.*, 557 F. App'x 896 (11th Cir. 2014), *and subsequently aff'd in part, vacated in part on other grounds*, 557 F. App'x 896 (11th Cir. 2014); *Williams v. Kamtek, Inc.*, No. 2:09-CV-1517-SLB, 2012 WL 13088657, at *8 (N.D. Ala. Mar. 26, 2012).

Under those principles, Ward cannot show pretext by pointing to the clerical error that caused the delayed payment of Ward's salary for May 20-21 and 24-28. As discussed in the section above, Kelly had legitimate, non-retaliatory reasons for telling Ward to stay home after the May 19 meeting. He fully intended for her to be paid for that time, and that is what he told her. [Doc. 55-2 ¶ 39.] Kelly directed

-12-

nobody to withhold payment. [*Id.*] After all, Kelly is the school principal, not a data clerk responsible for coding employee absences. [*See id.* ¶¶ 2, 39.] It was not until discovery in this case that CCSD learned Ward was not paid for May 20-21 and 24-28. [Doc. 66-8 ¶ 10.] This oversight resulted from a clerical error. [Docs. 55-2 ¶ 39; 66-8 ¶ 10-11.]

Ward points to no evidence suggesting this was anything more than an honest mistake — or that Kelly had a hand in it. CCSD continued to pay Ward during June and July. [Doc. 66-8 ¶ 9.] And when CCSD discovered the payroll error, it immediately fixed it and paid Ward for the days she stayed at home. [*Id.* ¶¶ 10-11.] On balance, no reasonable juror could find retaliatory intent or pretext based on a mere payroll or coding error that CCSD proactively fixed.

**B.    Ward has no viable remedy under the FMLA.**

CCSD is also entitled to summary judgment because Ward seeks no non-monetary relief and has no viable damages remedy under the FMLA. *See Aponte v. Brown & Brown of Fla., Inc.*, 806 F. App'x 824, 828 (11th Cir. 2020). To begin, Ward cannot survive by relying on the opinions of her damages expert (Dr. Yoruk), because his opinions are legally erroneous, unduly speculative, and inadmissible under Daubert and Rule 702. In opposing summary judgment, Ward's damages arguments are legally invalid for the same reasons Dr. Yoruk's opinions are inadmissible. Thus, the arguments in CCSD's prior Daubert briefing [Docs. 56 at 1-

2, 10-24; 62 at 6-12] apply with full force here, and, in the interest of brevity, CCSD incorporates them by reference herein.

To quickly summarize, Ward seeks four types of monetary relief under Subsection I of the FMLA's damages provision (29 U.S.C. § 2617(a)(1)(A)(i)) and the FMLA's equitable relief provision (29 U.S.C. § 2617(a)(1)(B)): (i) lost free time; (ii) increased commuting costs; (iii) diminished social security earnings; and (iv) lost salary payments. Of those, only the lost salary payments would be a form of "lost compensation" potentially recoverable under § 2617(a)(1)(A)(i)(I). Ward had only a half-month pay-gap between CCSD and APS, and Ward's increased salary at APS fully offset that pay-gap and cut-off any claim for front-pay. *See Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988); *Nord v. U.S. Steel Corp.*, 758 F.2d 1462, 1472 (11th Cir. 1988). The remaining categories of damages do not meet the statutory definition of lost "wages, salary, employment benefits, or other compensation" under § 2617(a)(1)(A)(i)(I).

They also are not recoverable under the FMLA's equitable relief provision. For monetary relief to be available as an equitable remedy, it must be either (i) restitutionary in nature or (ii) incidental to injunctive relief. *Chauffers, Teamsters and Helpers, Loc. No. 391 v. Terry*, 494 U.S. 558, 570-71 (1990). Because Ward's remaining categories of alleged damage meet neither criterion, they are not recoverable as front pay under 29 U.S.C. § 2617(a)(1)(B). *See Moncrief v. Federal-*

-14-

*Mogul Powertrain LLC*, No. 5:20-cv-01215-HNJ, 2022 WL 1405417, *18 (N.D. Ala. Mar. 30, 2022).

## **CONCLUSION.**

This Court should GRANT CCSD's summary judgment motion.

This this 8th day of April 2024.

*/s/ Jeffrey R. Daniel*

Jeffrey R. Daniel (GA Bar No. 949075)

*Counsel for Defendant*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE
Suite 1500
Atlanta, GA 30309
678.690.5750
jeffdaniel@parkerpoe.com

Nana Asante-Smith

*Admitted pro hac vice*

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street
Raleigh, NC 27602
919.828.0564
nanaasantesmith@parkerpoe.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This 8th day of April 2024.

/s/ Jeffrey R. Daniel
Jeffrey R. Daniel
GA Bar No. 949075
*Counsel for Defendant*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE
Suite 1500
Atlanta, GA 30309
678.690.5750
jeffdaniel@parkerpoe.com

Nana Asante-Smith
*Admitted pro hac vice*

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street
Raleigh, NC 27602
919.828.0564
nanaasantesmith@parkerpoe.com

-16-

## CERTIFICATE OF SERVICE

This is to certify that I have, this day, filed the foregoing DEFENDANT'S

REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

with the Clerk of Court using the CM/ECF system, which will automatically send e-

mail notification of such filing to all parties of record as follows:

> Jackie Lee, Esq.
> LEE LAW FIRM, LLC
> 695 Pylant Street NE
> Suite 105
> Atlanta, Georgia 30306
> jackie@leelawga.com

This 8th day of April, 2024.

> /s/ Jeffrey R. Daniel
> Jeffrey R. Daniel (GA Bar No. 949075)
> *Counsel for Defendant*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
678.690.5750
jeffdaniel@parkerpoe.com

> Nana Asante-Smith
> *Admitted pro hac vice*

PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street
Raleigh, NC 27602
919.828.0564
nanaasantesmith@parkerpoe.com